# UNITED STATES *v.* CARLTON

No. 92–1941.   Argued February 28, 1994—Decided June 13, 1994

BLACKMUN, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, KENNEDY, SOUTER, and GINSBURG, JJ., joined. O'CONNOR, J., filed an opinion concurring in the judgment, *post*, p. 35. SCALIA, J., filed an opinion concurring in the judgment, in which THOMAS, J., joined, *post*, p. 39.

*Kent L. Jones* argued the cause for the United States. With him on the brief were *Solicitor General Days, Acting Assistant Attorney General Paup, Deputy Solicitor General Wallace, Gilbert S. Rothenberg,* and *Teresa E. McLaughlin.*

*Russell G. Allen* argued the cause and filed a brief for respondent. With him on the brief was *Phillip R. Kaplan.\**

JUSTICE BLACKMUN delivered the opinion of the Court.

In 1987, Congress amended a provision of the federal estate tax statute by limiting the availability of a recently added deduction for the proceeds of sales of stock to employee stock-ownership plans (ESOP's). Congress provided that the amendment would apply retroactively, as if incorporated in the original deduction provision, which had been adopted in October 1986. The question presented by this case is whether the retroactive application of the amendment violates the Due Process Clause of the Fifth Amendment.

---

*\*Briefs of *amici curiae* urging affirmance were filed for the Washington Legal Foundation et al. by *Joseph E. Schmitz, Charles A. Shanor, Daniel J. Popeo,* and *Paul D. Kamenar;* and for Anthony C. Morici, Jr., Executor and Trustee of the estate of McNamee, by *Charles C. Marson.*

## I

Congress effected major revisions of the Internal Revenue Code in the Tax Reform Act of 1986, 100 Stat. 2085. One of those revisions was the addition of a new estate tax provision applicable to any estate that filed a timely return after the date of the Act, October 22, 1986. The new provision, codified as 26 U. S. C. § 2057 (1982 ed., Supp. IV),[1] granted a deduction for half the proceeds of "any sale of employer securities by the executor of an estate" to "an employee stock ownership plan." § 2057(b).[2] In order to qualify for the deduction, the sale of securities had to be made "before the date on which the [estate tax] return . . . [was] required to be filed (including any extensions)." § 2057(c)(1).

Respondent Jerry W. Carlton, the executor of the will of Willametta K. Day, deceased, sought to utilize the § 2057 deduction. Day died on September 29, 1985. Her estate tax return was due December 29, 1986 (after Carlton had obtained a 6-month filing extension). On December 10, 1986, Carlton used estate funds to purchase 1.5 million shares of MCI Communications Corporation for $11,206,000, at an average price of $7.47 per share. Two days later, Carlton sold the MCI stock to the MCI ESOP for $10,575,000, at an average price of $7.05 per share. The total sale price thus was $631,000 less than the purchase price. When Carlton filed the estate tax return on December 29, 1986, he claimed a deduction under § 2057 of $5,287,000, for half the proceeds of the sale of the stock to the MCI ESOP. The deduction reduced the estate tax by $2,501,161. The parties have stipu-

---

[1] Section 2057 was repealed for estates of decedents who died after December 19, 1989. See Omnibus Budget Reconciliation Act of 1989, § 7304(a), 103 Stat. 2352.

[2] Section 2057(e) defined "employer securities" by reference to § 409(*l*) of the Code, which in turn defined the term generally as "common stock issued by the employer (or by a corporation which is a member of the same controlled group) which is readily tradable on an established securities market." 26 U. S. C. § 409(*l*)(1) (1982 ed., Supp. IV).

lated that Carlton engaged in the MCI stock transactions specifically to take advantage of the § 2057 deduction.

On January 5, 1987, the Internal Revenue Service (IRS) announced that, "[p]ending the enactment of clarifying legislation," it would treat the § 2057 deduction as available only to estates of decedents who owned the securities in question immediately before death. See IRS Notice 87–13, 1987–1 Cum. Bull. 432, 442. A bill to enact such an amendment to § 2057 was introduced in each Chamber of Congress on February 26, 1987. See 133 Cong. Rec. 4145 and 4293 (1987).

On December 22, 1987, the amendment to § 2057 was enacted. As amended, the statute provided that, to qualify for the estate tax deduction, the securities sold to an ESOP must have been "directly owned" by the decedent "immediately before death." Omnibus Budget Reconciliation Act of 1987, § 10411(a), 101 Stat. 1330–432.[3] The 1987 amendment was made effective as if it had been contained in the statute as originally enacted in October 1986. § 10411(b).

The IRS disallowed the deduction claimed by Carlton under § 2057 on the ground that the MCI stock had not been owned by his decedent "immediately before death." Carlton paid the asserted estate tax deficiency, plus interest, filed a claim for refund, and instituted a refund action in the United States District Court for the Central District of California. He conceded that the estate did not qualify for the deduction under the 1987 amendment to § 2057. He argued, however, that retroactive application of the 1987 amendment to the estate's 1986 transactions violated the Due Process Clause of the Fifth Amendment. The District Court rejected his argument and entered summary judgment in favor of the United States.

A divided panel of the Court of Appeals for the Ninth Circuit reversed. 972 F. 2d 1051 (1992). The majority consid-

---

[3] The amendment also required that employer securities qualifying for the deduction must, after the sale, be allocated to participants or held for future allocation in accordance with certain rules.

ered two factors paramount in determining whether retroactive application of a tax violates due process: whether the taxpayer had actual or constructive notice that the tax statute would be retroactively amended, and whether the taxpayer reasonably relied to his detriment on preamendment law. The court concluded that both factors rendered retroactive application of the amendment in this case unduly harsh and oppressive and therefore unconstitutional. Judge Norris dissented. In his view, the 1987 amendment was within the wide latitude of congressional authority to legislate retroactively in regulating economic activity. We granted certiorari, 510 U. S. 810 (1993).

## II

This Court repeatedly has upheld retroactive tax legislation against a due process challenge. See, *e. g.*, *United States* v. *Hemme*, 476 U. S. 558 (1986); *United States* v. *Darusmont*, 449 U. S. 292 (1981); *Welch* v. *Henry*, 305 U. S. 134 (1938); *United States* v. *Hudson*, 299 U. S. 498 (1937); *Milliken* v. *United States*, 283 U. S. 15 (1931); *Cooper* v. *United States*, 280 U. S. 409 (1930). Some of its decisions have stated that the validity of a retroactive tax provision under the Due Process Clause depends upon whether "retroactive application is so harsh and oppressive as to transgress the constitutional limitation." *Welch* v. *Henry*, 305 U. S., at 147, quoted in *United States* v. *Hemme*, 476 U. S., at 568–569. The "harsh and oppressive" formulation, however, "does not differ from the prohibition against arbitrary and irrational legislation" that applies generally to enactments in the sphere of economic policy. *Pension Benefit Guaranty Corporation* v. *R. A. Gray & Co.*, 467 U. S. 717, 733 (1984). The due process standard to be applied to tax statutes with retroactive effect, therefore, is the same as that generally applicable to retroactive economic legislation:

"Provided that the retroactive application of a statute is supported by a legitimate legislative purpose furthered

by rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches . . . .

"To be sure, . . . retroactive legislation does have to meet a burden not faced by legislation that has only future effects. . . . 'The retroactive aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former' . . . . But that burden is met simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose." *Id.*, at 729–730, quoting *Usery* v. *Turner Elkhorn Mining Co.*, 428 U. S. 1, 16–17 (1976).

There is little doubt that the 1987 amendment to § 2057 was adopted as a curative measure. As enacted in October 1986, § 2057 contained no requirement that the decedent have owned the stock in question to qualify for the ESOP proceeds deduction. As a result, any estate could claim the deduction simply by buying stock in the market and immediately reselling it to an ESOP, thereby obtaining a potentially dramatic reduction in (or even elimination of) the estate tax obligation.

It seems clear that Congress did not contemplate such broad applicability of the deduction when it originally adopted § 2057. That provision was intended to create an "incentive for stockholders to sell their companies to their employees who helped them build the company rather than liquidate, sell to outsiders or have the corporation redeem their shares on behalf of existing shareholders." Joint Committee on Taxation, Tax Reform Proposals: Tax Treatment of Employee Stock Ownership Plans (ESOPs), 99th Cong., 2d Sess., 37 (Joint Comm. Print 1985); see also 132 Cong. Rec. 14507 (1986) (statement of Sen. Long) (§ 2057 "allow[s] . . . an executor to reduce taxes on an estate by one-half by selling the decedent's company to an ESOP"). When Congress initially enacted § 2057, it estimated a revenue loss from the

deduction of approximately $300 million over a 5-year period. See 133 Cong. Rec. 4145 (1987) (statement of Rep. Rosten-kowski); *id.*, at 4293 (statement of Sen. Bentsen). It became evident shortly after passage of the 1986 Act, however, that the expected revenue loss under § 2057 could be as much as $7 billion—over 20 times greater than anticipated—because the deduction was not limited to situations in which the dece-dent owned the securities immediately before death. *Ibid.* In introducing the amendment in February 1987, Senator Bentsen observed: "Congress did not intend for estates to be able to claim the deduction by virtue of purchasing stock in the market and simply reselling the stock to an ESOP . . . and Congress certainly did not anticipate a $7 billion revenue loss." *Id.*, at 4294. Without the amendment, Senator Bent-sen stated, "taxpayers could qualify for the deductions by engaging in essentially sham transactions." *Ibid.*

We conclude that the 1987 amendment's retroactive appli-cation meets the requirements of due process. First, Con-gress' purpose in enacting the amendment was neither ille-gitimate nor arbitrary. Congress acted to correct what it reasonably viewed as a mistake in the original 1986 provision that would have created a significant and unanticipated reve-nue loss. There is no plausible contention that Congress acted with an improper motive, as by targeting estate repre-sentatives such as Carlton after deliberately inducing them to engage in ESOP transactions. Congress, of course, might have chosen to make up the unanticipated revenue loss through general prospective taxation, but that choice would have burdened equally "innocent" taxpayers. Instead, it de-cided to prevent the loss by denying the deduction to those who had made purely tax-motivated stock transfers. We cannot say that its decision was unreasonable.

Second, Congress acted promptly and established only a modest period of retroactivity. This Court noted in *United States* v. *Darusmont,* 449 U. S., at 296, that Congress "almost without exception" has given general revenue statutes effec-

tive dates prior to the dates of actual enactment. This "customary congressional practice" generally has been "confined to short and limited periods required by the practicalities of producing national legislation." *Id.*, at 296–297. In *Welch* v. *Henry*, 305 U. S. 134 (1938), the Court upheld a Wisconsin income tax adopted in 1935 on dividends received in 1933. The Court stated that the " 'recent transactions' " to which a tax law may be retroactively applied "must be taken to include the receipt of income during the year of the legislative session preceding that of its enactment." *Id.*, at 150. Here, the actual retroactive effect of the 1987 amendment extended for a period only slightly greater than one year. Moreover, the amendment was proposed by the IRS in January 1987 and by Congress in February 1987, within a few months of § 2057's original enactment.

Respondent Carlton argues that the 1987 amendment violates due process because he specifically and detrimentally relied on the preamendment version of § 2057 in engaging in the MCI stock transactions in December 1986. Although Carlton's reliance is uncontested—and the reading of the original statute on which he relied appears to have been correct—his reliance alone is insufficient to establish a constitutional violation. Tax legislation is not a promise, and a taxpayer has no vested right in the Internal Revenue Code. Justice Stone explained in *Welch* v. *Henry*, 305 U. S., at 146–147:

> "Taxation is neither a penalty imposed on the taxpayer nor a liability which he assumes by contract. It is but a way of apportioning the cost of government among those who in some measure are privileged to enjoy its benefits and must bear its burdens. Since no citizen enjoys immunity from that burden, its retroactive imposition does not necessarily infringe due process . . . ."

Moreover, the detrimental reliance principle is not limited to retroactive legislation. An entirely prospective change in

the law may disturb the relied-upon expectations of individuals, but such a change would not be deemed therefore to be violative of due process.

Similarly, we do not consider respondent Carlton's lack of notice regarding the 1987 amendment to be dispositive. In *Welch* v. *Henry,* the Court upheld the retroactive imposition of a tax despite the absence of advance notice of the legislation. And in *Milliken* v. *United States,* the Court rejected a similar notice argument, declaring that a taxpayer "should be regarded as taking his chances of any increase in the tax burden which might result from carrying out the established policy of taxation." 283 U. S., at 23.

In holding the 1987 amendment unconstitutional, the Court of Appeals relied on this Court's decisions in *Nichols* v. *Coolidge,* 274 U. S. 531 (1927), *Blodgett* v. *Holden,* 275 U. S. 142 (1927), and *Untermyer* v. *Anderson,* 276 U. S. 440 (1928). Those cases were decided during an era characterized by exacting review of economic legislation under an approach that "has long since been discarded." *Ferguson* v. *Skrupa,* 372 U. S. 726, 730 (1963). To the extent that their authority survives, they do not control here. *Blodgett* and *Untermyer,* which involved the Nation's first gift tax, essentially have been limited to situations involving "the creation of a wholly new tax," and their "authority is of limited value in assessing the constitutionality of subsequent amendments that bring about certain changes in operation of the tax laws." *United States* v. *Hemme,* 476 U. S., at 568. *Nichols* involved a novel development in the estate tax which embraced a transfer that occurred 12 years earlier. The amendment at issue here certainly is not properly characterized as a "wholly new tax," and its period of retroactive effect is limited. Nor do the above cases stand for the proposition that retroactivity is permitted with respect to income taxes, but prohibited with respect to gift and estate taxes. In *Hemme* and *Milliken,* this Court upheld retroactive features of gift and estate taxes.

## III

In focusing exclusively on the taxpayer's notice and reliance, the Court of Appeals held the congressional enactment to an unduly strict standard. Because we conclude that retroactive application of the 1987 amendment to § 2057 is rationally related to a legitimate legislative purpose, we conclude that the amendment as applied to Carlton's 1986 transactions is consistent with the Due Process Clause.

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

JUSTICE O'CONNOR, concurring in the judgment.

The unamended 26 U. S. C. § 2057, which allowed taxpayers to reduce the taxable estate by buying securities and reselling them to employee stock ownership plans (ESOP's), made it possible to avoid estate taxes by structuring transactions in a certain way. But the tax laws contain many such provisions. See, *e. g.,* 26 U. S. C. § 2055 (allowing deductions from taxable estate for transfers to the government, charities, and religious organizations). And § 2057 was only the latest in a series of congressional efforts to promote ESOP's by providing tax incentives. See, *e. g.,* 26 U. S. C. § 133 (partial income tax exclusion for interest paid to banks on ESOP loans); 26 U. S. C. § 1042 (allowing certain taxpayers to defer capital gains taxes on sale of securities to ESOP's).

Thus, although respondent Carlton may have made a "purely tax-motivated stock transfe[r]," *ante,* at 32, I do not understand the Court to express any normative disapproval of this course of action. As executor of Willametta Day's estate, it was entirely appropriate for Carlton to seek to reduce the estate taxes. And like all taxpayers, Carlton was entitled to structure the estate's affairs to comply with the tax laws while minimizing tax liability. As Learned Hand observed with characteristic acerbity:

> "[A] transaction, otherwise within an exception of the tax law, does not lose its immunity, because it is actuated by a desire to avoid, or, if one choose, to evade, taxation. Any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes. Therefore, if what was done here, was what was intended by [the statute], it is of no consequence that it was all an elaborate scheme to get rid of [estate] taxes, as it certainly was." *Helvering* v. *Gregory*, 69 F. 2d 809, 810 (CA2 1934) (citations omitted), aff'd, 293 U. S. 465 (1935).

To say that Carlton did nothing wrong in claiming the deduction does not, of course, answer the question whether Congress deprived him of due process by amending § 2057. As we have noted, "the retroactive aspects of economic legislation, as well as the prospective aspects, must meet the test of due process: a legitimate legislative purpose furthered by rational means." *General Motors Corp.* v. *Romein,* 503 U. S. 181, 191 (1992) (internal quotation marks omitted).

The Court finds it relevant that, according to prominent members of the tax-writing committees of each House, the statute as originally enacted would have cost the Government too much money and would have allowed taxpayers to avoid tax by engaging in sham transactions. See *ante,* at 31–32. Thus, the Court reasons that the amendment to § 2057 served the legislative purpose of "correct[ing]" a "mistake" Congress made the first time. *Ante,* at 32. But this mode of analysis proves too much. Every law touching on an area in which Congress has previously legislated can be said to serve the legislative purpose of fixing a perceived problem with the prior state of affairs—there is no reason to pass a new law, after all, if the legislators are satisfied with the old one. Moreover, the subjective motivation of Members of Congress in passing a statute—to the extent it can

even be known—is irrelevant in this context: It is sufficient for due process analysis if there exists *some* legitimate purpose underlying the retroactivity provision. Cf. *FCC* v. *Beach Communications, Inc.*, 508 U. S. 307, 313–315 (1993).

Retroactive application of revenue measures is rationally related to the legitimate governmental purpose of raising revenue. In enacting revenue measures, retroactivity allows "the legislative body, in the revision of tax laws, to distribute increased costs of government among its taxpayers in the light of present need for revenue and with knowledge of the sources and amounts of the various classes of taxable income during the taxable period preceding revision." *Welch* v. *Henry*, 305 U. S. 134, 149 (1938). For this reason,

> "[i]n enacting general revenue statutes, Congress almost without exception has given each such statute an effective date prior to the date of actual enactment. . . . Usually the 'retroactive' feature has application only to that portion of the current calendar year preceding the date of enactment, but [some statutes have been] applicable to an entire calendar year that had expired preceding enactment. This 'retroactive' application apparently has been confined to short and limited periods required by the practicalities of producing national legislation. We may safely say that it is a customary congressional practice." *United States* v. *Darusmont*, 449 U. S. 292, 296–297 (1981) *(per curiam)*.

But "the Court has never intimated that Congress possesses unlimited power to 'readjust rights and burdens . . . and upset otherwise settled expectations.'" *Connolly* v. *Pension Benefit Guaranty Corporation*, 475 U. S. 211, 229 (1986) (O'CONNOR, J., concurring) (brackets omitted), quoting *Usery* v. *Turner Elkhorn Mining Co.*, 428 U. S. 1, 16 (1976). The governmental interest in revising the tax laws must at some point give way to the taxpayer's interest in finality and

repose. For example, a "wholly new tax" cannot be imposed retroactively, *United States* v. *Hemme*, 476 U. S. 558, 568 (1986), even though such a tax would surely serve to raise money. Because the tax consequences of commercial transactions are a relevant, and sometimes dispositive, consideration in a taxpayer's decisions regarding the use of his capital, it is arbitrary to tax transactions that were not subject to taxation at the time the taxpayer entered into them. See *Welch* v. *Henry, supra,* at 147.

Although there is also an element of arbitrariness in retroactively changing the rate of tax to which the transaction is subject, or the availability of a deduction for engaging in that transaction, our cases have recognized that Congress must be able to make such adjustments in an attempt to equalize actual revenue and projected budgetary requirements. In every case in which we have upheld a retroactive federal tax statute against due process challenge, however, the law applied retroactively for only a relatively short period prior to enactment. See *United States* v. *Hemme, supra,* at 562 (1 month); *United States* v. *Darusmont, supra,* at 294–295 (10 months); *United States* v. *Hudson,* 299 U. S. 498, 501 (1937) (1 month). In *Welch* v. *Henry, supra,* the tax was enacted in 1935 to reach transactions completed in 1933; but we emphasized that the state legislature met only biannually and it made the revision "at the first opportunity after the tax year in which the income was received." 305 U. S., at 151. A period of retroactivity longer than the year preceding the legislative session in which the law was enacted would raise, in my view, serious constitutional questions. But in keeping with Congress' practice of limiting the retroactive effect of revenue measures (a practice that may reflect Congress' sensitivity to the due process problems that would be raised by overreaching), the December 1987 amendment to § 2057 was made retroactive only to October 1986. Given our precedents and the limited period of retroactivity, I con-

cur in the judgment of the Court that applying the amended statute to respondent Carlton did not violate due process.

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, concurring in the judgment.

If I thought that "substantive due process" were a constitutional right rather than an oxymoron, I would think it violated by bait-and-switch taxation. Although there is not much precision in the concept "'harsh and oppressive,'" which is what the Court has adopted as its test of substantive due process unconstitutionality in the field of retroactive tax legislation, see, *e. g., United States* v. *Hemme,* 476 U. S. 558, 568–569 (1986), quoting *Welch* v. *Henry,* 305 U. S. 134, 147 (1938), surely it would cover a retroactive amendment that cost a taxpayer who relied on the original statute's clear meaning over $600,000. Unlike the tax at issue in *Hemme,* here the amendment "without notice, . . . gives a different and more oppressive legal effect to conduct undertaken before enactment of the statute." 476 U. S., at 569.

The Court attempts to minimize the amendment's harshness by characterizing it as "a curative measure," quoting some post-legislation legislative history (another oxymoron) to show that, despite the uncontested plain meaning of the statute, Congress never meant it to apply to stock that was not owned by the decedent at the time of death. See *ante,* at 31–32. I am not sure that whether Congress has treated a citizen oppressively should turn upon whether the oppression was, after all, only Congress' "curing" of its own mistake. Even if it should, however, what was done to respondent here went beyond a "cure." The retroactivity not only hit him with the tax that Congress "meant" to impose originally, but it caused his expenditures incurred in invited reliance upon the earlier law to become worthless. That could have been avoided, of course, by providing a tax credit for such expenditures. Retroactively disallowing the tax bene-

fit that the earlier law offered, without compensating those who incurred expenses in accepting that offer, seems to me harsh and oppressive by any normal measure.

The Court seeks to distinguish our precedents invalidating retroactive taxes by pointing out that they involved the imposition of new taxes rather than a change in tax rates. See *ante*, at 34. But eliminating the specifically promised reward for costly action *after* the action has been taken, and refusing to reimburse the cost, is even more harsh and oppressive, it seems to me, than merely imposing a new tax on past actions. The Court also attempts to soften the impact of the amendment by noting that it involved only "a modest period of retroactivity." *Ante*, at 32. But in the case of a tax-incentive provision, as opposed to a tax on a continuous activity (like the earning of income), the critical event is the taxpayer's reliance on the incentive, and the key timing issue is whether the change occurs after the reliance; that it occurs immediately after rather than long after renders it no less harsh.

The reasoning the Court applies to uphold the statute in this case guarantees that *all* retroactive tax laws will henceforth be valid. To pass constitutional muster the retroactive aspects of the statute need only be "rationally related to a legitimate legislative purpose." *Ante*, at 35. Revenue raising is certainly a legitimate legislative purpose, see U. S. Const., Art. I, § 8, cl. 1, and any law that retroactively adds a tax, removes a deduction, or increases a rate rationally furthers that goal. I welcome this recognition that the Due Process Clause does not prevent retroactive taxes, since I believe that the Due Process Clause guarantees *no* substantive rights, but only (as it says) process, see *TXO Production Corp.* v. *Alliance Resources Corp.*, 509 U. S. 443, 470–471 (1993) (SCALIA, J., concurring in judgment).

I cannot avoid observing, however, two stark discrepancies between today's due process reasoning and the due process reasoning the Court applies to its identification of new so-

called fundamental rights, such as the right to structure family living arrangements, see *Moore* v. *East Cleveland*, 431 U. S. 494 (1977) (plurality opinion), and the right to an abortion, see *Roe* v. *Wade*, 410 U. S. 113 (1973). First and most obviously, where respondent's claimed right to hold onto his property is at issue, the Court upholds the tax amendment because it rationally furthers a legitimate interest; whereas when other claimed rights that the Court deems fundamental are at issue, the Court strikes down laws that concededly promote legitimate interests, *id.*, at 150, 162. Secondly, when it is pointed out that the Court's retroactive-tax ruling today is inconsistent with earlier decisions, see, *e. g., Nichols* v. *Coolidge*, 274 U. S. 531 (1927); *Blodgett* v. *Holden*, 275 U. S. 142 (1927); *Untermyer* v. *Anderson*, 276 U. S. 440 (1928), the Court dismisses those cases as having been "decided during an era characterized by exacting review of economic legislation under an approach that 'has long since been discarded.'" *Ante*, at 34, quoting *Ferguson* v. *Skrupa*, 372 U. S. 726, 730 (1963). But *economic* legislation was not the *only* legislation subjected to "exacting review" in those bad old days, and one wonders what principled reason justifies "discarding" that bad old approach *only as to that category.* For the Court continues to rely upon "exacting review" cases of the *Nichols-Blodgett-Untermyer* vintage for its due process "fundamental rights" jurisprudence. See, *e. g., Roe, supra*, at 152–153, 159 (citing *Meyer* v. *Nebraska*, 262 U. S. 390, 399 (1923), and *Pierce* v. *Society of Sisters*, 268 U. S. 510, 535 (1925)); see also *Griswold* v. *Connecticut*, 381 U. S. 479, 483 (1965) ("[W]e reaffirm the principle of the *Pierce* and the *Meyer* cases").

The picking and choosing among various rights to be accorded "substantive due process" protection is alone enough to arouse suspicion; but the categorical and inexplicable exclusion of so-called "economic rights" (even though the Due Process Clause explicitly applies to "property") unquestionably involves policymaking rather than neutral legal analy-

42

sis.    I would follow the text of the Constitution, which sets forth certain substantive rights that cannot be taken away, and adds, beyond that, a right to due process when life, liberty, or property is to be taken away.