[669 NYS2d 613]

MIRIAM OSBORN MEMORIAL HOME ASSOCIATION, Appellant, v MARK R. CHASSIN, as Commissioner of the New York State Department of Health, et al., Respondents.

Second Department, March 2, 1998

### APPEARANCES OF COUNSEL

*Cadwalader, Wickersham & Taft,* New York City *(Peter G. Bergmann, Kathy Hirata Chin* and *William J. Natbony* of counsel), for appellant.

*Dennis C. Vacco, Attorney-General,* New York City *(Kay-Ann D. Porter* of counsel), for respondents.

### OPINION OF THE COURT

ROSENBLATT, J. P.

Public Health Law § 2807-d imposes monetary assessments on residential health care facilities requiring them to pay a percentage of gross receipts from all patient care services and operating income during specified time periods. The question before us is whether that section may be enforced lawfully and constitutionally as against the appellant, Miriam Osborn Memorial Home Association (hereinafter the Osborn), a not-for-profit residential health care facility (hereinafter RHCF) in Rye, New York.

The Osborn claims that the assessment provisions were enacted by the Legislature in response to the State's budgetary deficit as a means of averting the less palatable alternative of reducing Medicaid reimbursement rates to health care providers. The Osborn does not participate and has never participated in the Medicaid program. It argues that the Legislature could not have intended that the assessments imposed by Public Health Law § 2807-d be applied to it in that it would have been unaffected by a reduction in Medicaid rates and, therefore, should not be singled out to pay an assessment that was designed ultimately to benefit Medicaid providers.[1]

The Osborn seeks declaratory and injunctive relief alleging, among other things, a violation of its right to equal protection

---

1. Although assessments are not normally regarded by the payer as a benefit, here the benefit was in the form of an ameliorative action in that

under the State and Federal Constitutions. It seeks to bar the defendants (hereinafter referred to collectively as the State) from collecting the statutory assessments.

The Supreme Court, *inter alia,* granted the State's motion for summary judgment dismissing the complaint and for partial summary judgment on its counterclaims, directing the Osborn to comply with the reporting requirements of Public Health Law § 2807-d. The Osborn has appealed.

### STATUTORY BACKGROUND

Medicaid, which was created by the Federal Government and is implemented by New York State, is designed to provide medical care for those who cannot afford it *(see,* 42 USC § 1396 *et seq.).* Medicaid expenditures for nursing home care consist of a State share of approximately 40%, a local share of approximately 10%, and a 50% matching Federal share *(see,* Social Services Law §§ 153, 368-a). The program is administered by the States in accordance with Federal requirements. In the context of the State's expenditures for Medicaid, Public Health Law § 2807-d was enacted under Laws of 1990 (ch 938, § 28) as a revenue-raising measure in connection with the deficit for the 1990-1991 fiscal year, so as to achieve savings in the Medicaid program.

Pursuant to Public Health Law § 2807-d, RHCFs (the Osborn's category) were to be assessed "on their gross receipts received from all patient care services and other operating income" on a cash basis during the 15-month period from January 1, 1991 through March 31, 1992 (Public Health Law § 2807-d [1] [a]). As originally enacted, the assessment for RHCFs was fixed at 0.6% of those gross receipts *(see,* Public Health Law § 2807-d [2] [b] [i]). To track the assessments, the statute also required all such facilities to submit quarterly and certified reports "on a cash basis of actual gross receipts received from all patient care services and operating income for each month" (Public Health Law § 2807-d [7] [a]). The legislative scheme also provided for enforcement against delinquent facilities by recoupment procedures from Medicaid, Blue Cross, and health maintenance organizations *(see,* Public Health Law § 2807-d [6] [c]).

Initially, the statute exempted certain facilities from the assessment. It spared only those that were voluntary nonprofit

the assessments were imposed instead of the vastly more painful alternative of a three hundred million dollar cut in Medicaid reimbursement rates *(see,* letter of Richard N. Gottfried, Chairman of NY State Assembly Comm on Health, Jan. 22, 1991).

and private proprietary facilities "experiencing severe fiscal hardship because of insufficient resources to finance losses resulting from bad debts and the costs of charity care" (Public Health Law § 2807-c [19] [c]).

Following the enactment, the Deputy Commissioner of the State Department of Health advised the Osborn that it must pay the assessment. Notably, he emphasized that the assessment was enacted "as an alternative to substantial Medicaid payment reductions which were considered necessary to resolve the State's current financial crisis".

The Osborn objected to the assessment, pointing out that it was not a participant in the Medicaid program and that an assessment against it would be unfair. The Osborn asserted that it "would be assessed without receiving the *quid pro quo* negotiated with the legislature in return for the assessment—unreduced Medicaid rates. Obviously, any reduction in Medicaid rates would not have impacted upon us".

While this dispute was being waged, the Legislature amended the statute in 1992. It eliminated the March 31, 1992 sunset date *(see,* L 1992, ch 41, §§ 54, 163). Further, it imposed an additional assessment of 1.2% on RHCFs over and above the initial 0.6% assessment *(see,* Public Health Law § 2807-d [2] [b] [ii]; L 1992, ch 41, § 5) which the State demanded of the Osborn. The 1992 statute also included a critical feature: the additional assessment of 1.2% for RHCFs was declared a reimbursable cost in determining a facility's Medicaid rate *(see,* Public Health Law § 2807-d [10] [b]; L 1992, ch 41, § 11). Finally, the amendments created two more categories of facilities that were exempted from the assessments: (1) voluntary nonprofit hospitals totally financed by charitable contributions or by the income thereon and dedicated to free care of low income patients, and (2) any facility dedicated solely to the care of police, firefighters, volunteer firefighters, and emergency service personnel *(see,* Public Health Law § 2807-d [1] [b] [ii], [iii]; L 1992, ch 41, § 4).

In keeping with the continuing nexus between the assessments and the Medicaid program, the 1992 legislative memorandum in support of the bill to amend Public Health Law § 2807-d set forth that its purpose was "[t]o implement cost containment initiatives and other cost reduction measures which will control Medicaid expenditure growth and produce savings for the State and local governments" (Mem of State Exec Dept, 1992 McKinney's Session Laws of NY, at 2512).

As a non-Medicaid provider, and an otherwise unexempted facility, the Osborn continued to protest, but by the end of

1992 the Department of Health concluded that it would not relieve it from the reach of the statute.

Following the 0.6% and the 1.2% assessments, the Legislature again amended the statute to impose additional assessments on RHCFs, notably, an additional 3.8% for the period July 1, 1995 to March 31, 1996 (see, L 1995, ch 2, § 136; Public Health Law § 2807-d [2] [b] [iii]), 1.9% for the period of April 1, 1996 to March 31, 1997 (see, L 1996, ch 194, § 25; Public Health Law § 2807-d [2] [b] [iv]), 2.3% for the period of May 1, 1996 to December 31, 1996, and 1.9% for the period of January 1, 1997 to February 28, 1997 (see, L 1996, ch 309, § 274-h; ch 474, §§ 180-181; Public Health Law § 2807-d [2] [b] [v]).[2] Significantly, as with the earlier 1.2% assessment, the statute was amended to provide that these additional assessments were all considered reimbursable costs in determining a facility's Medicaid rate (see, L 1995, ch 2, § 139; L 1996, ch 194, § 28; ch 309, § 274-j; ch 474, § 182; Public Health Law § 2807-d [10] [b]). The 1995 and 1996 amendments also provided that a portion of the assessments would be deposited into a special fund to be used for Medicaid payments (see, L 1995, ch 2, § 138; L 1996, ch 194, § 27; ch 309, § 274-i; ch 639, § 49; Public Health Law § 2807-d [9]).

### THE OSBORN'S STATUS

Over a century ago the Osborn was created by a special act of the Legislature (see, L 1892, ch 94) for the purpose of providing a home for aged, needy women. All of the income and some of the principal of the endowment is used to run the home. It has a capacity of approximately 175 beds. As a non-Medicaid, not-for-profit facility, it has operated without any public reimbursement for its services, and it accepts no health insurance. It does not fit within any of the legislatively classified exemptions of Public Health Law § 2807-d (1) (b), in that it does not qualify under the severe economic hardship criterion of Public Health Law § 2807-c (19) (c), and, because it accepts some money from some patients, it is not totally financed by charitable contributions or by the income thereon dedicated to free care of low income patients. In addition, it is not dedicated "solely to the care of police, firefighters, volunteer firefighters, and emergency personnel" (2807-d [1] [b] [iii]). The parties have indicated that there are three other comparable not-for-profit facilities in New York State that do not participate in Medicaid, notably St. Rose's Home, Rosary Hill Home, and the Fireman's Home. Those three, however, have been exempted,

---

2. Only the 0.6% (1990) and 1.2% (1992) assessments are before us. The Osborn has commenced additional suits challenging these later assessments.

the first two because they are financed entirely by charitable contributions or income from them, and the third, owing to the firefighter's exemption.

The Osborn, therefore, unlike Medicaid-participant nursing homes, gets no reimbursement for the increased assessments, and it does not qualify for the statutory exemption. It is unique. It is the only not-for-profit nursing home in this State that does not get either an exemption or Medicaid reimbursement for the assessments.[3]

### THE CHALLENGE TO THE ASSESSMENT

We agree with the Osborn that Public Health Law § 2807-d was enacted to deal with the State's Medicaid expenditures. Although, as the State contends, the statute is a general revenue raising measure as to which the assessment monies are deposited by the Commissioner and credited to the general fund, there is no escaping the conclusion that the measure was designed to deal with budget gaps caused by Medicaid expenses. As the United States Supreme Court observed, Public Health Law § 2807-d was enacted when New York was "faced with the choice of either curtailing its Medicaid program or generating additional revenue to reduce the program deficit" *(De Buono v NYSA-ILA Med. & Clinical Servs. Fund,* 520 US —, —, 117 S Ct 1747, 1749).

It does not follow, however, that the linkage between Medicaid and Public Health Law § 2807-d in and of itself immunizes the Osborn from any and all State assessments against RHCFs. We distinguish between the initial 0.6% assessment and what followed, notably the additional 1.2% assessment before us. We conclude that the 0.6% assessment of 1990 *(see,* Public Health Law § 2807-d [2] [b] [i]), in contrast to the 1.2% assessment of 1992 *(see,* Public Health Law § 2807-d [2] [b] [ii]), was a valid, constitutionally imposed assessment that bore a rational relationship to the legitimate State interest of raising revenues to reduce the budget and Medicaid deficit. The 0.6% assessment applies across the board to all nursing facilities (except those exempted) and it is not reimbursable.

The State maintains that taxing statutes enacted for the purpose of raising revenue are within its constitutional functions and prerogatives *(see, Shapiro v City of New York,* 32 NY2d 96, 102; *United States v Carlton,* 512 US 26, 30-31), and that the Osborn's status as a nonparticipant in Medicaid does

---

**3.** We base this on the parties' briefs and on what the parties told us at oral argument. If we were to learn that there are one or two others so situated, it would not change our decision on this appeal.

not disempower the State from exacting assessments against it or deprive the Osborn of equal protection or due process *(see, Cleburne v Cleburne Living Ctr.,* 473 US 432, 440). The State's position is that the Legislature has not exempted non-Medicaid providers, and so the Osborn must pay. By way of analogy, a resident of a school district must pay school taxes even though that resident may have no children.

This argument is persuasive enough to justify constitutionally the 1990 0.6% assessment only. It falls flat thereafter, considering that the State changed the rules in 1992 by imposing an additional 1.2% and allowing only the Medicaid participants to gain reimbursement while denying it to the Osborn. In so doing, the State left only the Osborn to pay it all, affording it no relief either by exemption or reimbursement. To continue the analogy, it is as though a school district imposed an added tax on residents, and then adjusted it so that only the childless residents would have to pay it, or, worse yet, that it imposed that tax only on the sole childless taxpayer in the array. By imposing an additional 1.2% assessment and scalpelling out virtually every other RHCF by way of exemption or reimbursement, the 1.2% assessment falls singularly on the Osborn *(see,* n 3, *supra).*

The Osborn has pointed out compellingly that it is, in effect, being penalized for its attempts at self-sufficiency. It maintains that by pressing it unfairly, the State is forcing it to surrender its self-reliance and enter the world of government-subsidized care. If the Osborn were forced to do so it would, ironically, increase the State's Medicaid liability by significantly more than the assessments sought to be imposed.

We thus agree with the Osborn that the added 1.2% is a palpably arbitrary assessment, inconsonant with the statutory purpose, and grossly unequal when visited exclusively upon it.

A tax or assessment will rarely fall with exquisite perfection and equality on all who are slated to pay. The relative impacts cannot be measured with the precision of an eyedropper. To meet equal protection criteria, however, there must be general uniformity of treatment of those similarly situated, the classifications for disparity must be reasonable, and the taxes imposed must be uniform within the class *(see, Foss v City of Rochester,* 65 NY2d 247; *Trump v Chu,* 65 NY2d 20; *see also, Lehnhausen v Lake Shore Auto Parts Co.,* 410 US 356; *Allied Stores v Bowers,* 358 US 522). By singling out the Osborn to pay the full, unreimbursable 1.2% assessment, the State denied the Osborn equal protection under the Federal and State

Constitutions. Accordingly, the order is modified by (1) deleting the provision thereof granting so much of the defendants' motion which was for summary judgment dismissing those branches of the complaint which were for a judgment declaring that Public Health Law § 2807-d (2) (b) (ii) is unconstitutional as applied to the plaintiff and to enjoin the defendants from enforcing Public Health Law § 2807-d (2) (b) (ii), and substituting therefor a provision denying those branches of the defendants' motion, and (2) deleting the provision thereof denying so much of the plaintiff's cross motion which was for summary judgment on those branches of the complaint which were for a judgment declaring that Public Health Law § 2807-d (2) (b) (ii) is unconstitutional as applied to the plaintiff and to enjoin the defendants from enforcing Public Health Law § 2807-d (2) (b) (ii), and substituting therefor a provision granting those branches of the plaintiff's cross motion.

RITTER, KRAUSMAN and FLORIO, JJ., concur.

Ordered that the order is modified by (1) deleting the provision thereof granting so much of the defendants' motion which was for summary judgment dismissing those branches of the complaint which were for a judgment declaring that Public Health Law § 2807-d (2) (b) (ii) is unconstitutional as applied to the plaintiff and to enjoin the defendants from enforcing Public Health Law § 2807-d (2) (b) (ii), and substituting therefor a provision denying those branches of the defendants' motion, and (2) deleting the provision thereof denying so much of the plaintiff's cross motion which was for summary judgment on those branches of the complaint which were for a judgment declaring that Public Health Law § 2807-d (2) (b) (ii) is unconstitutional as applied to the plaintiff and to enjoin the defendants from enforcing Public Health Law § 2807-d (2) (b) (ii), and substituting therefor a provision granting those branches of the plaintiff's cross motion; as so modified, the order is affirmed, with costs to the appellant.