OPINION
 

 THOMPSON, Presiding Judge.
 

 ¶ 1 Richard L. and Shira S. Baker appeal the trial court’s grant of summary judgment on their claims that the alternative fuel statutes enacted in December 2000 violated the Contract Clauses of the United States and the Arizona Constitutions and deprived them of due process. For the reasons that follow, we affirm.
 

 FACTUAL AND PROCEDURAL BACKGROUND
 

 ¶ 2 The important facts are not in dispute. Beginning in the early 1990s, the Arizona Legislature authorized a variety of tax and grant incentives designed to encourage the purchase of or conversion to alternative fuel vehicles (AFVs). These incentives were part of a broad tax and regulatory program to improve Arizona’s air quality. The legislature has continuously modified the program, with significant changes occurring in 1994, 1996, 1998, and 1999.
 

 ¶ 3 On April 28, 2000, Governor Jane D. Hull signed Senate Bill 1504 (the April Law).
 
 See
 
 2000 Ariz. Sess. Laws, ch. 405. This statute enhanced tax credits and other benefits for persons who owned vehicles powered by alternative fuel, defined as a fuel source other than gasoline or a combination fuel using no more than 30 percent petroleum. Ariz.Rev.Stat. (A.R.S.) § 1-215(4) (Supp.2002);
 
 see
 
 2000 Ariz. Sess. Laws, ch. 405, §§ 1-47. Pursuant to amendments of A.R.S. § 43-1086 of the Arizona Tax Code, taxpayers could obtain a new 100 percent tax credit for the cost of AFV conversions, in addition to 30 to 50 percent credits for the price of the vehicle. The April Law also provided tax credits for “bi-fuel” AFVs, which are capable of operating on either gasoline or an alternative fuel such as propane. Finally, the April Law amended A.R.S. § 43-1086 to allow a minimum $30,000 tax credit for the conversion of a vehicle over 12,000 pounds in weight, regardless of its cost.
 

 ¶ 4 The Bakers purchased two used motor homes in September 2000 for $6500 and $7250, respectively. By late September 2000, the governor had announced that the unforeseen cost of the program would require changes in the law, including paying out the tax credit over five years for those acquiring AFVs after October 11, 2000. Shortly before October 11, 2000, the Bakers purchased two more used motor homes for $7000 and $6500.
 

 ¶ 5 On October 20, 2000, the legislature imposed a moratorium on the April Law while it considered a long-term solution, and the governor asked those who had not yet completed their conversions to consider canceling their orders “for the good of the state.” Although Mr. Baker was contemporaneously aware of these events, the Bakers nevertheless had all four motor homes converted to bi-fuel AFVs, at the combined cost of $31,000, on November 7 and 8,2000.
 

 ¶ 6 In December 2000, the legislature enacted Senate Bill 1004 as an amendment to the April Law and capped the Bakers’ tax credit benefits at 100 percent of their costs (the December Law).
 
 See
 
 2000 Ariz. Sess. Laws, 7th Sp. Sess., ch. 1. Under this law, the tax credits under the program could be recaptured by the State if the participants
 
 *554
 
 did not comply with some additional requirements, such as:
 

 (1) the taxpayer must have had possession of the vehicle before December 1, 2000;
 

 (2) the taxpayer could not transfer the vehicle’s title for 36 months after receipt of the credit;
 

 (3) the taxpayer was required to keep the vehicle registered in Arizona for 36 months after receipt of the credit;
 

 (4) the taxpayer was required to demonstrate actual use of alternative fuel to power the vehicle, with different requirements depending on the type of alternative fuel used; and
 

 (5) the vehicle was required to meet certain emission requirements.
 

 A.R.S. § 43-1086(E) (Supp.2003).
 

 ¶ 7 In 2001, Arizona issued affidavits of $58,250 tax credits to the Bakers that covered all their costs in buying and “converting” the four vehicles. The Bakers then filed their income tax return and asked for and received the full cash value of those tax credits. They later amended their return to request an additional $92,750 that would have been available under the April Law. An Arizona Department of Revenue (ADOR) hearing officer denied that claim, ADOR’s director sustained the denial, and the Bakers appealed to the tax court.
 

 ¶ 8 The Bakers contended that the denial of the additional credit violated the Contract Clauses of the Arizona and the United States Constitutions.
 
 See
 
 U.S. Const. art. I, § 10; Ariz. Const. art. II, § 25. Their complaint further alleged that the State had deprived them of their due process rights under Article II, § 4 of the Arizona Constitution. The State denied the claims and asserted that allowing the additional credit would violate the anti-gift clause of the Arizona Constitution, art. 9, § 7.
 

 ¶ 9 The State then filed a motion for summary judgment accompanied by a forty-eight paragraph statement of undisputed facts. Acknowledging that they did not dispute these facts, the Bakers cross-moved for summary judgment. The tax court granted the State’s motion and denied the Bakers’ cross-motion. This appeal followed.
 

 DISCUSSION
 

 A. As a Matter of Law, the December Law Did Not Unconstitutionally Impair a “Contract” Created by the April Law.
 

 ¶ 10 On appeal from a grant of summary judgment on undisputed facts, we review de novo “whether the trial court correctly applied the law.”
 
 Tenet Healthsystem TGH, Inc. v. Silver,
 
 203 Ariz. 217, 219, ¶ 5, 52 P.3d 786, 788 (App.2002). In the case of a constitutional challenge, the “burden of establishing that [the] statute is unconstitutional rests on the party challenging its validity.”
 
 Hall v. A.N.R. Freight Sys., Inc.,
 
 149 Ariz. 130, 133, 717 P.2d 434, 437 (1986). We presume that statutes are constitutional and attempt to construe statutes in a constitutional manner when possible.
 
 Phoenix Newspapers, Inc. v. Superior Ct.,
 
 180 Ariz. 159, 163, 882 P.2d 1285, 1289 (App.1993).
 

 ¶ 11 The United States and Arizona Constitutions prohibit the passage of any law impairing the obligation of contracts.
 
 [1]
 
 To prove the unconstitutional impairment of a contract, the Bakers must prove: (1) the existence of a contract, and (2) an unconstitutional impairment of that contract. They fail on both counts.
 

 1. The April Law Did Not Create a Contract Between the State and the Bakers.
 

 ¶ 12 The Bakers contend that the April Law created a contract between them and the State. In general, “statutes
 
 do not
 
 
 *555
 
 create contract rights.”
 
 Proksa v. Ariz. State Schs. for the Deaf and the Blind,
 
 205 Ariz. 627, 629, ¶ 11, 74 P.3d 939, 941 (2003) (emphasis in original). As the Arizona Supreme Court has explained:
 

 [Ajbsent some clear indication that the legislature intends to bind itself contractually, the presumption is that “a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise.”
 

 Id.
 
 (quoting
 
 Nat’l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry.,
 
 470 U.S. 451, 465-66, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985) ).
 

 ¶ 13
 
 Proksa
 
 arose out of a statute stating that certain state school employees “shall be granted permanent employment status” after completing probation.
 
 Id.
 
 at 628, ¶ 3, 74 P.3d at 940 (citing A.R.S. § 15-1326(B) (1986) ). The plaintiffs were hired by a school and completed probation, thereby gaining permanent employee status.
 
 Id.
 
 The legislature then amended the statute and deleted the “permanent employment” language for certain employees, including the plaintiffs.
 
 Id.
 
 at ¶¶ 4-5. When the school later declined to continue their employment, the plaintiffs sued on the grounds that the State had violated a contract right arising under the statute.
 
 Id.
 
 at 628-29, ¶¶ 6-7, 74 P.3d at 940 — 41. The supreme court upheld the termination, finding that the “permanent employment status” language in the statute had not created a contract and that the plaintiffs had no “existing property interest under Arizona law in continued employment.”
 
 Id.
 
 at 632, ¶ 23, 74 P.3d at 944.
 

 ¶ 14
 
 Proksa
 
 emphasizes the important public purpose served by the presumption against statutorily created contract rights. A contrary rule, the court explained, would “enormously curtail the operation of democratic government” because statutes would become one-way “ratchets, creating rights that could never be retracted or even modified” without buying off those upon whom rights had been conferred.
 
 Id.
 
 at 629, ¶ 12, 74 P.3d at 941. Likewise, the United States Supreme Court has stated that the “principal function of a legislature is not to make contracts, but to make laws that establish the policy of the state.”
 
 Nat’l R.R. Passenger,
 
 470 U.S. at 466, 105 S.Ct. 1441 (citation omitted). “Policies,” the Court stated, “unlike contracts, are inherently subject to revision and repeal, and to construe laws as contracts when the obligation is not clearly and unequivocally expressed would be to limit drastically the essential powers of a legislative body.”
 
 Id.
 

 ¶ 15 Far from expressing a clear and unequivocal intent to form a contract, the April Law modified the tax code to offer a “credit against taxes” to one who “purchases or leases” an AFV from a private party. This was part of the State’s evolving policy efforts to improve air quality. In
 
 National Railroad Passenger,
 
 the Supreme Court similarly held that “pervasive prior regulation” of the railroads left “no legitimate expectation” that “regulation would cease after 1971.” 470 U.S. at 469-470, 105 S.Ct. 1441;
 
 accord U.S. West Communications, Inc. v. Ariz. Corp. Comm’n,
 
 197 Ariz. 16, 22, ¶ 19, 3 P.3d 936, 942 (App.1999).
 
 [2]
 

 2. Even if the April Law Created a Contract, the December Law Would Not Constitute an Invalid Impairment.
 

 ¶ 16 Even assuming that the April Law created a contract with the Bakers, no constitutional violation would occur unless the impairment was substantial.
 
 See In re
 
 
 *556
 

 Dobert,
 
 192 Ariz. 248, 253, 963 P.2d 327, 332 (App.1998) (because a party lacked any reasonable expectation that her beneficiary status would continue, her interest in remaining the designated beneficiary was not substantially impaired by a statute’s revocation provision). In the case of a substantial impairment, a court could still uphold the law if it is justified by a “significant and legitimate public purpose,” and the law’s “adjustment of the rights and responsibilities” is “reasonable” and “appropriate to the public purpose justifying [the legislation’s] adoption.”
 
 Energy Reserves Group, Inc. v. Kan. Power & Light Co.,
 
 459 U.S. 400, 411-12, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983) (citation omitted). These standards apply because, notwithstanding the Contract Clause, a state “continues to possess authority to safeguard the vital interests of its people.”
 
 Home Bldg. & Loan Ass’n v. Blaisdell,
 
 290 U.S. 398, 434, 54 S.Ct. 231, 78 L.Ed. 413 (1934).
 

 a. As a Matter of Law, Limiting the Bakers’ Benefits to 100 Percent of Their Costs Does Not Substantially Impair Their Rights.
 

 ¶ 17 This court has explained that the reasonable expectations of the complaining party to the contract play an “important role” in deciding whether a law substantially impairs that contract.
 
 Dobert,
 
 192 Ariz. at 253, 963 P.2d at 332. As in
 
 National Railroad Passenger,
 
 470 U.S. at 469, 105 S.Ct. 1441, “the pervasiveness of the prior regulation” in this alternative fuel area suggests that absent some affirmative indication to the contrary, the Bakers had “no legitimate expectation that regulation would cease” after passage of the April Law.
 

 ¶ 18 From the outset, it was not unreasonable to assume that the April Law would change when the statute offered $30,000 in cash to buy a $6000 used motor home that was not required to use anything but gasoline. Even Mrs. Baker conceded that she was “very skeptical” of the April Law, finding it “hard to believe that such an incentive was available.” The benefits sounded “a little too good to be true.” By the time the Bakers converted their vehicles in November 2000, they were on notice from what they had read and heard in the media that the governor and the legislature were going to change the statute to close the loopholes and contain the cost.
 

 ¶ 19 The December Law allowed the Bakers to recover 100 percent of their costs and to keep the profits from selling their vehicles. They could not reasonably have expected more from a taxpayer-funded program designed to curb air pollution.
 

 b. As a Matter of Law, the Adjustment of the Bakers’ Rights Was Reasonable and Appropriate to Accomplish an Important Public Purpose.
 

 ¶ 20 Even if the December Law substantially impaired a contract with the Bakers, it would not offend the constitution if the adjustment of the rights and responsibilities of the contracting parties was upon reasonable conditions and appropriate to the public purpose.
 
 United States Trust Co. v. New Jersey,
 
 431 U.S. 1, 22, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977). The April Law was riddled with loopholes that demanded a resolution, especially as the potential cost mushroomed to hundreds of millions of dollars. As Governor Hull observed, the April Law “jeopardize[d] all our other budget priorities.” Moreover, it made “no sense to pay hundreds of millions of taxpayer dollars [for] a flawed program and get nothing in return.”
 

 ¶ 21 Instead of disputing these facts, the Bakers argue that, under
 
 United States Trust,
 
 this case requires “strict scrutiny” and that a potential loss of $800 million is not a “compelling reason” for the December Law. We reject these arguments.
 
 United States Trust
 
 states that “complete deference” to a legislative assessment of reasonableness and necessity is not appropriate.
 
 Id.
 
 at 26, 97 S.Ct. 1505. We agree with this standard and independently determine that the State’s action was reasonable and appropriate.
 

 ¶ 22 Nor have courts consistently rejected a fiscal crisis argument, as the Bakers sug
 
 *557
 
 gest. For example, in
 
 Subway-Surface Supervisors Association v. New York City Transit Authority,
 
 the court upheld legislation barring previously allowed wage increases for city workers due to a financial emergency. 44 N.Y.2d 101, 404 N.Y.S.2d 323, 375 N.E.2d 384 (Ct.App.1978). In light of the “financial crisis,” the wage freeze served an important public purpose.
 
 Id.
 
 404 N.Y.S.2d 323, 375 N.E.2d at 389.
 

 ¶ 23 Likewise, the United States Supreme Court upheld the retroactive removal of a tax deduction against a constitutional due process challenge in
 
 United States v. Carlton,
 
 512 U.S. 26, 114 S.Ct. 2018, 129 L.Ed.2d 22 (1994). The Court explained that “Congress acted to correct what it reasonably viewed as a mistake in the original 1986 provision that would have created a significant and unanticipated revenue loss.”
 
 Id.
 
 at 32, 114 S.Ct. 2018. That is a legitimate and important public purpose.
 
 [3]
 

 B. As a Matter of Law, the Retroactive Application of A.R.S. § 43-1086 So As to Limit the Bakers’ Tax Benefits to 100 Percent of Their Costs Did Not Violate Their Due Process Rights.
 

 ¶ 24 The Bakers alternatively contend that the December Law deprived them of vested due process rights under the April Law. We disagree. Because the tax provisions did not create vested rights, no due process violation could occur.
 

 ¶ 25 To sustain a due process claim, a plaintiff must demonstrate a protected liberty or property interest. Property for these purposes includes “any vested right of any value.”
 
 Rio Rico Props., Inc. v. Santa Cruz County,
 
 172 Ariz. 80, 88, 834 P.2d 166, 174 (Tax 1992) (citation omitted).
 

 ¶ 26 As the Ninth Circuit has observed, the United States Supreme Court has never sustained a due process challenge to the retroactive application of an income tax.
 
 Licari v. Comm’r of Internal Revenue,
 
 946 F.2d 690, 694 (9th Cir.1991). And in the more recent decision of
 
 United States v. Carlton,
 
 “the Supreme Court left no doubt as to the deferential due process standard applicable to challenges to retroactive tax legislation.”
 
 Quarty v. United States,
 
 170 F.3d 961, 965 (9th Cir.1999).
 

 ¶ 27
 
 Carlton
 
 dealt with the Tax Reform Act of 1986 (the TRA), which created a new estate tax deduction for the sale to an employee stock ownership plan (ESOP) of stock in the decedent’s company. 512 U.S. at 28, 114 S.Ct. 2018. The plaintiffs contended that the deduction “was enacted to induce taxpayers to sell shares at a discounted price to an ESOP, thus furthering the public policy of employee ownership” that the federal government had long sought to promote.
 
 Carlton v. United States,
 
 972 F.2d 1051, 1060 (9th Cir.1992),
 
 rev’d, United States v. Carlton,
 
 512 U.S. 26, 114 S.Ct. 2018, 129 L.Ed.2d 22 (1995). In passing the TRA, Congress estimated a revenue loss from the deduction of approximately $300 million over a five-year period.
 
 Carlton,
 
 512 U.S. at 31-32,114 S.Ct. 2018.
 

 ¶ 28 The problem with the TRA was that it did not require the stock to be owned by the decedent prior to his or her death. Jerry W. Carlton, the estate’s executor, relied on the new deduction in buying 1,500,000 shares of MCI Communications Corp. (MCI) stock with $11,206,000 in estate funds, then selling the shares two days later to the MCI ESOP for a $631,000 loss.
 
 Id.
 
 at 28, 114 S.Ct. 2018. The sole purpose of the transaction was to take advantage of the deduction.
 
 Id.
 
 at 28-29, 114 S.Ct. 2018. Using the deduction, the estate would come out ahead despite the loss on the stock. If disallowed, the estate would be out $631,000.
 

 ¶ 29 Shortly after the TRA’s passage, it became evident that the expected revenue
 
 *558
 
 loss would be more than twenty times the projected level.
 
 Id.
 
 at 32, 114 S.Ct. 2018. Accordingly, Congress retroactively amended the TRA in 1987 to require that securities sold to an ESOP must have been directly owned by the decedent immediately before death.
 
 Id.
 
 at 29, 114 S.Ct. 2018. Unlike the Bakers, who made a profit, Carlton was left with a $631,000 loss.
 
 See id.
 

 ¶ 30 A divided Ninth Circuit panel sided with Carlton and found the retroactive amendment unconstitutional because he had “reasonably and detrimentally relied” on the original statute.
 
 Carlton,
 
 972 F.2d at 1059-60. The United States Supreme Court unanimously reversed, finding the amendment “neither illegitimate nor arbitrary” because Congress properly acted to correct what it reasonably viewed as a mistake in the original law that would have created a significant and unanticipated revenue loss.
 
 Carlton,
 
 512 U.S. at 32-33, 114 S.Ct. 2018. Moreover, the amendment contained only a modest period of retroactivity — slightly more than one year.
 
 Id.
 

 ¶ 31 Applying this analysis, we find that the December Law survives the due process challenge. The Bakers do not contend that the December Law was illegitimate or arbitrary. Rather, it was enacted to stem an unexpected revenue loss and fill loopholes, such as the deletion of the requirement that the AFV actually use alternative fuel and the lack of resale restrictions, that did not further the objectives of improving air quality and reducing dependence upon foreign oil.
 
 See Montana Rail Link, Inc. v. United States,
 
 76 F.3d 991, 994 (9th Cir.1996) (relying upon
 
 Carlton
 
 and holding that “preventing a loss of government revenue is a legitimate legislative purpose”). In addition, the period of retroactivity here is modest. The December Law was passed within eight months of the April Law and within the same tax year.
 

 ¶ 32
 
 Carlton
 
 also specifically rejects the Bakers’ detrimental reliance and vested rights arguments.
 
 Carlton
 
 states that the taxpayer’s “reliance alone is insufficient to establish a constitutional violation. Tax legislation is not a promise, and a taxpayer has no vested right in the Internal Revenue Code.”
 
 Carlton,
 
 512 U.S. at 33, 114 S.Ct. 2018;
 
 accord Rivers v. State,
 
 327 S.C. 271, 490 S.E.2d 261, 263 (1997) (stating that “ease law from the United States Supreme Court and courts throughout the country makes clear that taxpayers have no vested interest in tax laws remaining unchanged”) (citations omitted).
 

 ¶ 33 The Bakers attempt to distinguish
 
 Carlton
 
 on the grounds that (1) the April Law was not part of the tax code’s substantive provisions and “it was only tangentially that the tax code was implicated at all,” and (2) that
 
 Carlton
 
 was limited to drafting errors. We are not persuaded.
 

 ¶ 34 The statute at issue in this case, A.R.S. § 43-1086, is part of the tax code. It was this statute that capped the Bakers’ benefits at 100 percent of their costs.
 
 See
 
 A.R.S. § 43-1086(B)(14). To bring this appeal, the Bakers first had to exhaust their remedies through the ADOR. Moreover, to obtain their benefits, the Bakers were required to obtain affidavits of tax credit and file income tax returns relating to those credits. Manifestly, the tax code forms the basis of the Bakers’ claim.
 
 [4]
 

 ¶ 35 The drafting error argument raises a distinction without a difference. According
 
 *559
 
 to the Bakers, Congress was only retroactively clarifying the statute at issue in
 
 Carlton
 
 to “correct a drafting error in the original law, so as to reconcile the language of the statute with its original intent.” In
 
 Quarty,
 
 the Ninth Circuit considered and rejected this argument. 170 F.3d 961. There, the retroactive legislation was clearly not “curative of a congressional mistake” but the court said the plaintiffs were “wrong” in claiming “that this distinction makes any difference to Taxpayers’ due process claim.” Id. at 968.
 

 ¶ 36 As in
 
 Carlton,
 
 this case concerns a “mistake” in a prior law that would have created a significant and unanticipated revenue loss. More importantly,
 
 Carlton
 
 clarifies that a retroactive modification of a tax benefit is constitutionally permissible as long as its purpose is neither illegitimate nor arbitrary and the period of retroactivity is modest. Nothing in the opinion limits constitutional retroactivity to drafting errors.
 

 ¶ 37 Accordingly, we reject the Bakers’ due process argument. Our holding that the Bakers had no vested rights obviates the need to address the alternative arguments employing the vested rights analysis.
 

 CONCLUSION
 

 ¶ 38 We affirm the tax court’s rulings in all respects. In addition, we deny the Bakers’ request for costs and reasonable attorneys’ fees incurred in connection with this appeal.
 

 CONCURRING: JOHN C. GEMMILL, Judge and LAWRENCE F. WINTHROP, Judge.
 

 [1]
 

 . The United States Constitution provides: "No State shall ... pass any ... Law impairing the Obligation of Contracts.” U.S. Const. art. I, § 10. Similarly, the Arizona Constitution states: "No ... law impairing the obligation of a contract, shall ever be enacted.” Ariz. Const. art. 2, § 25.
 

 [2]
 

 . The Bakers rely upon
 
 Bennett v. Nichols, 9
 
 Ariz. 138, 80 P. 392 (1905), but their reliance is misplaced. That territorial court decision states that a tax exemption given to railroads was a “contract right.”
 
 Id.
 
 at 151, 80 P. at 396. Because the court had already held that the legislature had not intended to end the exemption, the sentence is pure dicta.
 
 Id.
 
 at 150-51, 80 P. at 396. Moreover, a one-time railroad tax exemption bears no resemblance to the evolving alternative fuel program. More importantly, the
 
 Bennett
 
 dicta is at odds with the body of modern case law, including
 
 Proksa.
 

 [3]
 

 . In another case cited by the Bakers, the court did not reject the fiscal crisis as a legitimate justification but found that no such crisis had been shown.
 
 See Sonoma County Org. v. County of Sonoma,
 
 23 Cal.3d 296, 152 Cal.Rptr. 903, 591 P.2d 1 (1979) (finding an unconstitutional impairment when the government entities failed to meet their burden of establishing that a fiscal crisis existed).
 

 [4]
 

 . No reported Arizona decision discusses
 
 Carlton.
 
 But like the United States Supreme Court, Arizona courts have not found a vested right to exist in a tax code provision.
 

 Rio Rico,
 
 cited by plaintiffs in support of their claim, involved a suit filed by a plaintiff whose property had been wrongly assessed for several years. The plaintiff sued under the county enabling act, A.R.S. § 11-506, which enables taxpayers to obtain a refund from a county treasurer "to the extent of the erroneous tax paid.”
 
 Id.
 
 at 87-88, 834 P.2d at 173-74. The legislature then amended the statute to narrow the meaning of "erroneous assessment” to "clerical or computational” errors only and purported to make the statute retroactive to 1986.
 
 Id.
 
 at 83, 88, 834 P.2d at 169, 174. The amendment did not change the tax law; it simply eliminated the plaintiff's right to obtain a refund of the tax that had been improperly collected.
 

 The county contended in
 
 Rio Rico
 
 that "a person cannot have a vested right in a tax.”
 
 Id.
 
 at 90, 834 P.2d at 176. The tax court did not reject that argument; rather, it implicitly accept
 
 *559
 
 ed it. The court went on to explain that A.R.S. § 11-506 “does not define or impose a tax.”
 
 Id.
 
 at 90-91, 834 P.2d at 176-77. Rather, it just provides a right to a refund of money
 
 illegally collected
 
 that "may become a vested right.”
 
 Id.
 
 Because the property owner’s lawsuit had been filed "before the amending act became effective,” the plaintiff ultimately succeeded on his vested rights claim.
 
 Id.
 
 at 90, 834 P.2d at 176.
 

 The Bakers similarly misplace their reliance upon
 
 S & R Properties v. Maricopa County,
 
 178 Ariz. 491, 500, 875 P.2d 150, 159 (App.1993), and
 
 E.C. Garcia and Co. v. Arizona Department of Revenue,
 
 178 Ariz. 510, 875 P.2d 169 (App.1993). Both cases address A.R.S. § 11-506 and find a right to a refund of an illegally collected tax. Like the
 
 Rio Rico
 
 taxpayer, the plaintiffs had filed suit before the amended statute became effective.
 

 These Arizona cases stand for the proposition that when the government wrongly collects a tax from someone who does not owe it, it is generally unconstitutional not to return the illegally collected tax. This analysis does not apply to legislative changes to substantive tax provisions, nor does it provide a vested right in the tax law.