OKLAHOMA INDEPENDENT PETROLEUM ASSOCIATION v. POTTS



 

 
 
 
 
 
 Skip to Main Content
 Accessibility Statement
 
 
 
 
 
 Help
 Contact Us
 
 
 
 
 e-payments
 Careers
 
 
 
 
 
 
 
 
 
 
 
 Home
 Courts
 Decisions
 Programs
 News
 Legal Research
 Court Records
 Quick Links
 
 
 
 
 
 OSCN Found Document:OKLAHOMA INDEPENDENT PETROLEUM ASSOCIATION v. POTTS

 

 
 



 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 OKLAHOMA INDEPENDENT PETROLEUM ASSOCIATION v. POTTS
2018 OK 24
Case Number: 116679
Decided: 03/19/2018
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2018 OK 24, __ P.3d __

 
NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

OKLAHOMA INDEPENDENT PETROLEUM ASSOCIATION, S. KIM HATFIELD, and LUKE ESSMAN, Petitioners,
v.
RAY H. POTTS, MICHAEL O. THOMPSON, and MARY LYNN PEACHER, Respondents.

ORIGINAL PROCEEDING TO DETERMINE THE CONSTITUTIONAL VALIDITY OF INITIATIVE PETITION NO. 416, STATE QUESTION NO. 795

¶0 This is an original proceeding to determine the legal sufficiency of Initiative Petition No. 416, State Question No. 795. The petition seeks to amend the Oklahoma Constitution by adopting Article XIII-C, a new Article. The proposed Article XIII-C would primarily serve to increase funding for public education through an increase in the gross production tax. The opponent petitioners allege the petition is unconstitutional because it creates a retroactive tax in violation of U.S. Const. amend. V. and because it violates the one general subject rule of Okla. Const. art. 24, § 1. Upon review, we hold that the petition is legally sufficient.

INITIATIVE PETITION NO. 416, STATE QUESTION NO. 795 IS 
LEGALLY SUFFICIENT FOR SUBMISSION TO THE PEOPLE OF
OKLAHOMA

Robert G. McCampbell, Adam C. Doverspike, and Jake M. Krattiger, GableGotwals, Oklahoma City, Oklahoma, for Petitioners.

Anthony J. Ferate, Edmond, Oklahoma, for Petitioner Oklahoma Independent Petroleum Association.

Joel L. Wohlgemuth, Ryan A. Ray, Alix R. Newman, Norman Wohlgemuth Chandler Jeter Barnett & Ray, P.C., Tulsa, Oklahoma, for Respondents.

COMBS, C.J.

¶1 On December 20, 2017, Respondents Michael O. Thompson, Ray H. Potts, and Mary Lynn Peacher (collectively, Proponents) filed Initiative Petition No. 416, State Question No. 795 (IP 416) with the Oklahoma Secretary of State. IP 416 would create a new Article XIII-C in the Oklahoma Constitution. IP 416 contains 8 sections, which Proponents assert will levy a new 5% gross production tax on oil and gas production from certain wells, and provide for the deposit of the proceeds primarily in a new fund entitled the "Oklahoma Quality Instruction Fund" (the Fund). Monies from the Fund will be distributed: 1) 90% to common school districts of the State of Oklahoma to increase compensation and benefits for certified personnel, and the hiring, recruitment and retention thereof; and 2) 10% to the State Department of Education to promote school readiness, and to support compensation for instructors and other instructional expenses in "high-quality early learning centers" for at-risk children prior to entry into the common education system.

¶2 Section 1 of IP 416 creates the Fund. Section 2 creates the Oklahoma Quality Instruction Reserve Fund to ensure the Fund always has sufficient resources, and provides mechanisms for the transfer of monies. Section 3 levies a 5% tax on the gross value of the production of oil, gas, or oil and gas from all oil and gas wells spudded after July 1, 2015, during the first thirty-six months of production, commencing with the month of first production, from and after the effective date of the article. Section 4 provides for a $4,000 increase in compensation for certified personnel, including teachers, but excluding superintendents and assistant superintendents. Section 5 provides for the distribution of funds according to the percentage scheme noted in the previous paragraph above. Section 6 attempts to ensure that the new funds will be used to supplement existing funding rather than supplant it, and grants the Board of Equalization the power to specify the amount that was supplanted or replaced, preventing the Legislature from making appropriations until it makes an appropriation to replace the supplanted amount. Sections 7 and 8 provide an effective date and severability provision, respectively.

¶3 On January 10, 2018, Petitioners Oklahoma Independent Petroleum Association, S. Kim Hatfield, and Luke Essman (collectively, Protestants), timely filed an Application to Assume Original Jurisdiction in this Court protesting the sufficiency of IP 416 and the basis that it fails to pass constitutional muster.

I.

STANDARD OF REVIEW

¶4 "The first power reserved by the people is the initiative...." Okla. Const. art. 5, § 2; In re Initiative Petition No. 409, State Question No. 785, 2016 OK 51, ¶2, 376 P.3d 250; In re Initiative Petition No. 403, State Question No. 779, 2016 OK 1, ¶3, 367 P.3d 472. With that reservation comes "the power to propose laws and amendments to the Constitution and to enact or reject the same at the polls independent of the Legislature, and also reserve power at their own option to approve or reject at the polls any act of the Legislature." Okla. Cost. art. 5, § 1; In re Initiative Petition No. 409, 2016 OK 51 at ¶2; In re Initiative Petition No. 403, 2016 OK 1 at ¶3. "The right of the initiative is precious, and it is one which this Court is zealous to preserve to the fullest measure of the spirit and the letter of the law." In re Initiative Petition No. 382, State Question No. 729, 2006 OK 45, ¶3, 142 P.3d 400. See In re Initiative Petition No. 349, State Question No. 642, 1992 OK 122, ¶35, 838 P.2d 1.

¶5 However, while the fundamental and precious right of initiative petition is zealously protected by this Court, it is not absolute. Any citizen can protest the sufficiency and legality of an initiative petition. In re Initiative Petition No. 409, 2016 OK 51 at ¶2; In re Initiative Petition No. 384, State Question No. 731, 2007 OK 48, ¶2, 164 P.3d 125. "Upon such protest, this Court must review the petition to ensure that it complies with the 'parameters of the rights and restrictions [as] established by the Oklahoma Constitution, legislative enactments and this Court's jurisprudence.'" In re Initiative Petition No. 384, 2007 OK 48 at ¶2 (quoting In re Initiative Petition No. 379, State Question No. 726, 2006 OK 89, ¶16, 155 P.3d 32).

¶6 This Court has generally refused to declare a ballot initiative invalid in advance of a vote of the people except where there is a clear or manifest showing of unconstitutionality. In re Initiative Petition No. 403, 2016 OK 1 at ¶3; In re Initiative Petition No. 358, State Question No. 658, 1994 OK 27, ¶7, 870 P.2d 782. We have repeatedly emphasized both how vital the right of initiative is to the people of Oklahoma, as well as the degree to which we must protect it:

"Because the right of the initiative is so precious, all doubt as to the construction of pertinent provisions is resolved in favor of the initiative. The initiative power should not be crippled, avoided, or denied by technical construction by the courts."

In re Initiative Petition No. 403, 2016 OK 1 at ¶3 (quoting In re Initiative Petition No. 382, 2006 OK 45 at ¶3).

Accordingly, Opponents in this matter bear the burden of demonstrating the proposed initiative petition is clearly and manifestly unconstitutional. In re Initiative Petition No. 403, 2016 OK 1 at ¶3; In re Initiative Petition No. 362, State Question No. 669, 1995 OK 77, ¶12, 899 P.2d 1145.

II.

ANALYSIS

¶7 Opponents in this matter allege IP 416 is insufficient and must not be submitted to the voters as it stands because it is unconstitutional. Opponents challenge the constitutionality of IP 416 on two grounds: 1) Section 3 of IP 416 creates a retroactive tax in violation of U.S. Const. amend. V; and 2) IP 416 violates the single-subject requirements of Okla. Const. art. 24, § 1.

A. The new article proposed by IP 416 does not create a retroactive tax in
violation of U.S. Const. amend. V.

¶8 Opponents assert that IP 416 is unconstitutional because, due to a potential drafting error, the new proposed article creates a retroactive tax in violation of U.S. Const. amend. V. [1] The alleged issue is the language of section 3, which provides in pertinent part:

There is hereby levied a Gross Production Tax of five percent (5%) on the gross value of the production of oil, gas or oil and gas from all oil and gas wells spudded after July 1, 2015, during the first thirty-six (36) months of production, commencing with the month of first production, from and after the effective date of this Article XIII. (Emphasis added).

¶9 Opponents allege that because the last sentence of the above-quoted portion of IP 416 specifies "this Article XIII" and not "this Article XIII-C," the tax provision is effective from the effective date of Article XIII and not the new Article XIII-C, creating a retroactive tax because Article XIII has been in effect in various forms for decades. Under Opponents interpretation, the new Article would levy a new five percent tax on the gross value of the production of oil, gas, or oil and gas from all oil and gas wells spudded after July 1, 2015, for the first thirty-six months of production, applicable all the way back to July 1, 2015, itself.[2]

¶10 Because of this problem, Opponents argue IP 416 will levy a retroactive tax in violation of U.S. Const. amend. V, as interpreted by the Supreme Court of the United States. In U.S. v. Carlton, 512 U.S. 26, 30-31, 114 S.Ct. 2018, 129 L.Ed.2d 22 (1994), the Court stated that any retroactive tax legislation must: 1) be supported by a legitimate legislative purpose furthered by rational means; and 2) the period of retroactivity must be modest, lest it run afoul of U.S. Const. amend. V. The Carlton Court upheld as constitutional a piece of retroactive tax legislation that it viewed as curative, and therefore reasonable, with a moderate period of retroactivity:

We conclude that the 1987 amendment's retroactive application meets the requirements of due process. First, Congress' purpose in enacting the amendment was neither illegitimate nor arbitrary. Congress acted to correct what it reasonably viewed as a mistake in the original 1986 provision that would have created a significant and unanticipated revenue loss. There is no plausible contention that Congress acted with an improper motive, as by targeting estate representatives such as Carlton after deliberately inducing them to engage in ESOP transactions. Congress, of course, might have chosen to make up the unanticipated revenue loss through general prospective taxation, but that choice would have burdened equally "innocent" taxpayers. Instead, it decided to prevent the loss by denying the deduction to those who had made purely tax-motivated stock transfers. We cannot say that its decision was unreasonable.

512 U.S. at 32.[3]

¶11 Opponents admit that the reference to Article XIII rather than Article XIII-C may be a typographical error, but argue this Court lacks the authority to redraft a petition in the same way it is allowed to redraft a ballot title per 34 O.S. Supp. 2015 § 10.[4] Opponents argue the only remedy is to declare IP 416 insufficient and allow the proponents of the petition to withdraw it and refile pursuant to 34 O.S. Supp. 2015 8(E).[5]

¶11 However, this Court need not determine if the tax levied by IP 416 satisfies the requirements of Carlton, because an interpretation of IP 416 is possible that prevents any retroactive application of the tax provision. Further, such an interpretation is possible without this Court redrafting any part of the petition.

¶12 Proponents argue that there was no drafting error and the only reasonable interpretation of the language of Section three is that the effective date is that of the new article, Article XIII-C. Proponents focus on specific language: "from and after the effective date of this Article XIII." They argue use of the term "this" necessarily is self-referencing, and thus as drafted the tax must begin from the effective date of this Article XIII, which is Article XIII-C. Such an interpretation removes any retroactivity problem: per Section 7, the effective date of Article XIII-C will be the January 1 following the article's passage or the first day of the calendar month which is at least sixty days after the article's passage, whichever is sooner.

¶12 Under Proponents interpretation, should the article be adopted, on the effective date in Section 7, the tax will begin to be levied on the production from all oil and gas wells spudded after July 1, 2015, for however much of their first thirty-six (36) months of production still remains after the effective date. Given how Section 3 of IP 416 is worded, this is not the only possible interpretation of the language in question. However, it is the interpretation that avoids any potential retroactive application of the tax in question that might invalidate the provision on constitutional grounds. Because the right of the initiative is so precious, all doubt as to the construction of pertinent provisions is resolved in favor of the initiative. In re Initiative Petition No. 403, 2016 OK 1 at ¶3; In re Initiative Petition No. 382, 2006 OK 45 at ¶3.

¶13 The above rule is consistent with how this Court has long-handled constitutional challenges in other areas such as statutes, and indeed, is perhaps more forgiving due to the precious nature of the people's right to initiative. In Calvey v. Daxon, this Court explained of constitutional challenges to legislation:

If there are two possible interpretations --- one of which would hold the legislation unconstitutional, the construction must be applied which renders them constitutional. Unless a law is shown to be fraught with constitutional infirmities beyond a reasonable doubt, this Court is "bound to accept an interpretation that avoids constitutional doubt as to the validity of the provision."

2000 OK 17, ¶24, 997 P.2d 164 (quoting In Re: Okla. Capitol Improv., 1998 OK 25, ¶8, 958 P.2d 759) (footnotes omitted).

The ambiguous meaning of the pertinent provision of Section 3 is resolved in favor of an interpretation that does not create a retroactive tax in violation of U.S. Const. amend. V.

B. The new article proposed by IP 416 does not violate the single-subject
requirements of Okla. Const. art. 24, § 1.

¶14 Petitioners also assert IP 416 is legally insufficient because the proposed article violates the single-subject requirements of Okla. Const. art. 24, § 1.[6] Proposed amendments to the Oklahoma Constitution, even when made by article, must still embrace a single general subject. See In re Initiative Petition No. 403, State Question No. 779, 2016 OK 1, ¶¶1-2, 367 P.3d 472; In re Initiative Petition No. 342, State Question No. 628, 1990 OK 76, ¶¶1-4 797 P.2d 331; In re Initiative Petition No. 344, State Question No. 630, 1990 OK 75, ¶¶2-5, 797 P.2d 326. This Court applies a germaneness test to initiative petitions that seek to amend the Oklahoma Constitution by article, in order to determine whether they embrace a single general subject. In re Initiative Petition No. 403, 2016 OK 1 at ¶5; In re Initiative Petition No. 363, State Question No. 672, 1996 OK 122, ¶15, 927 P.2d 558.[7] In In re In re Initiative Petition No. 363, the Court described the test in the following manner:

[W]hen the proposed constitutional amendment is by a new article the test for gauging multiplicity of subjects is whether the changes proposed are all germane to a singular common subject and purpose or are essentially unrelated one to another.

When testing a proposed constitutional amendment for its components' germaneness, we look to whether each of its several facets bears a common concern or impacts one general object or subject.

1996 OK 122, ¶¶15-16, 927 P.2d 558.

¶15 Fairly recently, this Court applied the germaneness test to a substantially similar initiative petition to IP 416, and determined that the initiative petition in question did not violate the single-subject requirements of Okla. Const. art. 24, § 1. In re Initiative Petition No. 403, 2016 OK 1 at ¶2. The proposal at issue in that cause would have funded a constitutionally-set teacher pay raise via a new sales tax, as opposed to a new gross production tax. In re Initiative Petition No. 403, 2016 OK 1 at ¶11. The proposed Article XIII-C at issue in that cause would also have distributed the funds to more sources and for more educational funding purposes:

In the case before us, the proposed Article 13-C consists of seven sections. Section 1 creates the Oklahoma Education Improvement Fund. Section 2 levies an additional 1% sales and use tax with "[a]ll revenue from the sales tax and the use tax levied" being used to fund the Oklahoma Education Improvement Fund created by Section 1. Section 3 directs the percentage distribution of the monies in the Fund for certain educational purposes including, common education (69.5%), higher education (19.25%), career and technology education (3.25%), and early childhood education (8%). Section 4 provides for a $5,000 increase in teacher salaries to be funded with 86.33% of the common education distribution under Section 3. Section 5 directs that funds "expended or distributed from the Oklahoma Education Improvement Fund shall supplement, and shall not be used to supplant or replace, other state funds" supporting education. Section 5 also directs the State Board of Equalization to "examine and investigate appropriations from the Fund each year," and if it finds that education funding was supplanted by monies from the Fund, the State Board of Equalization must "specify the amount by which education funding was supplanted." If education funding was supplanted by monies from the Fund, Section 5 directs that "the Legislature shall not make any appropriations for the ensuing fiscal year until an appropriation in that amount is made to replenish the Oklahoma Education Improvement Fund." Section 6 provides the effective date of the proposed amendment, and Section 7 provides a severability clause.

In re Initiative Petition No. 403, 2016 OK 1 at ¶11 (footnotes omitted).

The similarities between the two proposals are readily apparent from the above description.

¶16 Opponents assert IP 416 is distinguishable from Initiative Petition No. 403, described above, and make several arguments as to why IP 416 violates the single-subject requirements of Okla. Const. art. 24, § 1. Opponents argue IP 416: 1) creates an unprecedented constitutionally-mandated pay raise for one profession; 2) reverses a 2014 legislative compromise that the oil and natural gas industry relied upon in drilling wells; 3) applies a retroactive tax to wells drilled in reliance upon that compromise; 4) targets for taxation an industry that the Legislature has historically set taxes on itself; 5) targets only one industry that is particularly important to Oklahoma's economy; 6) levies a tax within the Oklahoma Constitution itself; and 7) improperly rearranges the separation of powers by vesting new authority over legislative appropriations in the Board of Equalization.

¶17 Opponents stress the unique nature of the changes proposed by IP 416 as the reason it embraces more than one general subject. For example, Opponents stress it creates a new constitutional pay raise for all certified education personnel, written into the Oklahoma Constitution, which has never been done before. Opponents do not appear to argue that the Constitution cannot contain such a provision, but that the unique nature of the changes in and off itself gives rise to a single subject that must be considered on its own.

¶18 Opponents also take issue with the gross production tax imposed by IP 416 that will fund the increased pay for all certified personnel. Opponents argue that the effect of IP 416 is to undo recent legislation passed in 2014 that altered the gross production tax, and negatively affects those who relied on what they describe as a "legislative compromise." They also assert the new tax is effectively retroactive because it applies to production on wells drilled after July 1, 2015. As discussed in Part II.A, supra, the tax in question is not in fact retroactive, as it will not be applied to production prior to the effective date of the new Article XIII-C. However, Opponents still argue the tax will be applied to some production on wells drilled based on the assumption of a lower gross production tax, and this momentous shift justifies the new gross production tax being treated as a separate subject. Similarly, Opponents stress the constitutional nature of the tax and its targeting of one specific industry that is very important to Oklahoma as other reasons for why the new gross production tax constitutes a single subject that voters should consider on its own.

¶19 What Opponents present to this Court, however, are at their root policy arguments concerning IP 416. Arguments concerning whether the changes to be written into the Oklahoma Constitution by IP 416 are advisable are best made to Oklahoma voters, not to this Court. Under a single-subject analysis of a new proposed amendment by article, this Court looks to the proposed changes to determine if they are all germane to a singular common subject and purpose or are essentially unrelated one to another, not to whether they are novel or ill-advised. See In re In re Initiative Petition No. 363, 1996 OK 122 at ¶15.

¶20 This Court's recent decision in In re Initiative Petition No. 403, 2016 OK 1 at ¶12, is highly instructive. This Court explained of that initiative petition:

The subject of the proposed amendment is the Oklahoma Education Improvement Fund. Each section of the proposed amendment is "'reasonably interrelated and interdependent, forming an interlocking "package"'" [sic] deemed necessary by the initiatives' drafters to assure effective public education improvement funding. Proponents drafted the petition with each component being necessary to the accomplishment of one general design. The proposal stands or falls as a whole. For example, if a voter agrees that the Oklahoma Education Improvement Fund should be created but does not agree that an additional one cent sales tax is the appropriate funding mechanism to do so, then the voter must choose whether to approve the proposal based on such considerations. If, on the other hand, a voter agrees that an additional one cent sales tax is the appropriate funding mechanism to fund the Oklahoma Education Improvement Fund, but does not agree with the percentage distribution of the monies as set forth in Section 3, then again, the voter must choose whether to approve the proposal based on such considerations. Such choices are the consequence of the voting process rather than any constitutional defect in the proposal. The proposed initiative petition clearly constitutes a single scheme to be presented to voters, and each section is germane to creating and implementing the Oklahoma Education Improvement Fund.

In re Initiative Petition No. 403, 2016 OK 1 at ¶12 (footnotes omitted).

Much like the proposal in In re Initiative Petition No. 403, each section of the new proposed article in IP 416 is reasonably interrelated and interdependent, forming an interlocking package to achieve the goal of improving public education funding. Here, rather than the "Oklahoma Education Improvement Fund," we have the "Oklahoma Quality Instruction Fund." The type of tax levied is different, and the fund distribution is not identical (it is less complex and varied, in fact). However, the logic by which this Court determined each section of Initiative Petition No. 403 to be germane to creating and implementing its fund applies equally here. Each component was deemed by the drafters necessary to accomplish one general design, to improve funding for public education. Hard choices, such as determining whether the new gross production tax amount is the appropriate funding mechanism for the proposed increases in education funding, are the consequence of the voting process. They are not a constitutional defect.

¶21 Opponents' arguments concerning the powers granted to the Board of Equalization by the proposed new article are unpersuasive for similar reasons. Opponents discuss the hypothetical effects the powers granted to the Board of Equalization might have on the entire state budgeting process, asserting that when there is a budget shortfall, "education funding" would be required to be held constant resulting in a situation where "millions of dollars of additional cuts will have to be suffered by other agencies." Brief In Support of Application and Petition to Assume Original Jurisdiction and Review the Constitutionality of Initiative Petition No. 416, p.12. They also assert these powers are novel and would negatively affect the balance of separation of powers in Oklahoma.

¶22 These arguments, however, are almost identical to those made by the petitioners in In re Initiative Petition No. 403 and rejected by this Court. Concerning the speculative nature of the effect on the appropriations process, we noted:

[A]ny suggestion ... that the implementation of the Education Improvement Fund would negatively affect the legislative appropriations process or usurp legislative fiscal policy-making is entirely speculative at this point. We decline, at the pre-election stage, to declare the proposal unconstitutional on nothing more than speculation.

In re Initiative Petition No. 403, 2016 OK 1 at ¶17 (footnotes omitted).

Further, Opponents' arguments in this cause ignore the fact that the Board of Equalization already possesses much of the same power proposed by IP 416, pursuant to Okla. Const. art. 10, § 41 and other statutory provisions.

¶23 This Court described those powers in some detail in In re Initiative Petition No. 403. For purposes of comparison, that explanation is worth restating at length here:

In the case before us, opponents argue the proposal is misleading because voters will "think they are voting for teacher pay raises, when in fact, they are voting to significantly change our state's fiscal structure to give the Board of Equalization control over their local Representative and Senators deciding on education appropriations." This argument ignores the powers already conferred to the State Board of Equalization in the Oklahoma Constitution. Article 10, § 21 of the Oklahoma Constitution provides that the duty of the State Board of Equalization "shall be to adjust and equalize the valuation of real and personal property of the several counties in the state, and it shall perform such other duties as may be prescribed by law . . . ." Okla. Const. Art. 10, § 21(A) (emphasis added). In Art. 10, § 23, entitled "Balanced Budget," Section 23(1) states that "prior to the convening of each regular session of the Legislature, the State Board of Equalization shall certify the total amount of revenue which accrued during the last preceding fiscal year to the General Revenue Fund and to each Special Revenue Fund appropriated directly by the Legislature, and shall further certify amounts available for appropriation . . . of the revenues to be received by the state under the laws in effect at the time such determination is made, for the next ensuing fiscal year . . . ." Article 10, § 23(2) goes on to provide that "[t]he Legislature shall not pass or enact any bill, act or measure making an appropriation of money for any purpose until such certification is made and filed. . . ." All appropriations made in excess of such certification shall be "null and void" unless the Legislature follows certain specific procedures to adjust the certification amount.

In Art. 10, § 41, entitled the Oklahoma Education Lottery Trust Fund, the State Board of Equalization acts "to ensure that the funds from the trust fund are used to enhance and not supplant funding for education," and "examine[s] and investigate[s] appropriations from the trust fund each year." Art. 10, § 41(D). The State Board of Equalization "shall issue a finding and report which shall state whether appropriations from the trust fund were used to enhance or supplant education funding. If the State Board of Equalization finds that education funding was supplanted by funds from the trust fund, the Board shall specify the amount by which education funding was supplanted. In this event, the Legislature shall not make any appropriations for the ensuing fiscal year until an appropriation in that amount is made to replenish the trust fund." Id.

In Section 1521 of Title 69, which creates the Rebuilding Oklahoma Access and Driver Safety Fund, the State Board of Equalization also acts to "ensure that the funds from the ROADS Fund are used to enhance and not supplant state funding for the Department of Transportation," and "the State Board of Equalization shall examine and investigate expenditures from the fund each year." 69 O.S. Supp. 2013 § 1521(E). If the State Board of Equalization finds that funds were used to supplant state funding for the Department of Transportation, the Board "shall specify the amount by which such funding was supplanted," and in this event, "the Legislature shall not make any appropriations for the ensuing fiscal year until an appropriation in that amount is made to replenish state funding for the Department of Transportation."

The State Board of Equalization already examines the General Revenue Fund and each Special Revenue Fund and certifies to the Legislature the amounts available for appropriation in the upcoming fiscal year. The State Board of Equalization audits the Lottery Education Fund in the same way it would audit the Education Improvement Fund. The Lottery Education Fund was proposed and passed by the people in 2004.

In re Initiative Petition No. 403, 2016 OK 1 at ¶¶14-17 (footnotes omitted).

¶24 Opponents fail to demonstrate that the changes proposed by IP 416 are not all germane to a singular common subject and purpose. IP 416, much like Initiative Petition No. 403 on which it is obviously modelled, does not constitute logrolling and constitutes a single scheme to be presented to the voters of the State of Oklahoma.

III.
CONCLUSION

¶25 After fully considering Opponents' two constitutional challenges, this Court concludes that the new article proposed by IP 416 does not create a retroactive tax in violation of U.S. Const. amend. V and does not violate the single-subject requirements of Okla. Const. art. 24, § 1. It is the determination of this Court that IP 416 is legally sufficient for submission to the people of Oklahoma. Any petition for rehearing in this matter shall be filed no later than five (5) days from the date this opinion is handed down.

INITIATIVE PETITION NO. 416, STATE QUESTION NO. 795 IS
LEGALLY SUFFICIENT FOR SUBMISSION TO THE PEOPLE OF
OKLAHOMA

CONCUR: COMBS, C.J., GURICH, V.C.J., KAUGER (by separate writing), WINCHESTER, EDMONDSON, and REIF, JJ.

CONCUR SPECIALLY: WYRICK, J. (by separate writing)

RECUSED: COLBERT, J.

FOOTNOTES

[1] U.S. Const. amend. V provides:

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

[2] As Proponents note, Article XIII has been changed many times over past decades, making it difficult to pin down a single "effective date" for the Article. Regardless, such a date would be prior to July 1, 2015.

[3] Opponents cite cases from other jurisdictions to support their arguments that wholly new, rather than curative, legislation that is retroactive is not passed for a legitimate legislative purpose, see NetJets Aviation, Inc. v. Guillory, 207 Cal. App. 4th 26, 57-58 (2012), and a period of retroactivity of 2 to 3 years is not modest, see Rivers v. State, 490 S.E.2d 261, 278-79 (S.C. 1997).

[4] Title 34 O.S. Supp. 2015 § 10 provides:

A. Any person who is dissatisfied with the wording of a ballot title may, within ten (10) business days after the same is published by the Secretary of State as provided for in subsection I of Section 8 of this title, appeal to the Supreme Court by petition in which shall be offered a substitute ballot title for the one from which the appeal is taken. Upon the hearing of such appeal, the court may correct or amend the ballot title before the court, or accept the substitute suggested, or may draft a new one which will conform to the provisions of Section 9 of this title.

B. No such appeal shall be allowed as to the ballot title of constitutional and legislative enactments proposed by the Legislature.

[5] Title 34 O.S. Supp. 2015 § 8(E) provides:

E. Signature- gathering Deadline for Initiative Petitions. When an initiative petition has been filed in the office of the Secretary of State and all appeals, protests and rehearings have been resolved or the period for such has expired, the Secretary of State shall set the date for circulation of signatures for the petition to begin but in no event shall the date be less than fifteen (15) days nor more than thirty (30) days from the date when all appeals, protests and rehearings have been resolved or have expired. Notification shall be sent to the proponents specifying the date on which circulation of the petition shall begin and that the signatures are due within ninety (90) days of the date set. Each elector shall sign his or her legally registered name, address or post office box, and the name of the county of residence. Any petition not filed in accordance with this provision shall not be considered. The proponents of an initiative petition, any time before the final submission of signatures, may withdraw the initiative petition upon written notification to the Secretary of State.

[6] Okla. Const. art. 24, § 1 provides:

Any amendment or amendments to this Constitution may be proposed in either branch of the Legislature, and if the same shall be agreed to by a majority of all the members elected to each of the two (2) houses, such proposed amendment or amendments shall, with the yeas and nays thereon, be entered in their journals and referred by the Secretary of State to the people for their approval or rejection, at the next regular general election, except when the Legislature, by a two-thirds (2/3) vote of each house, shall order a special election for that purpose. If a majority of all the electors voting on any proposed amendment at such election shall vote in favor thereof, it shall thereby become a part of this Constitution.

No proposal for the amendment or alteration of this Constitution which is submitted to the voters shall embrace more than one general subject and the voters shall vote separately for or against each proposal submitted; provided, however, that in the submission of proposals for the amendment of this Constitution by articles, which embrace one general subject, each proposed article shall be deemed a single proposal or proposition.

[7] Petitioners in another cause challenging the constitutionality of IP 416 assert this Court should abandon the germaneness test we most recently applied in In re Initiative Petition No. 403. For reasons set out in Oklahoma Oil & Gas Association v. Michael O. Thompson, 2018 OK 26, --- P.3d ----, we decline to do so.

KAUGER, J., with whom WINCHESTER, J., joins in concurring:

¶1 I concur by reason of stare decisis based on this Court's decision in In Re Initiative Petition No. 403 State Question No., 779, 2016 OK 1, 367 P.3d 472.

Wyrick, J., concurring specially:

¶1 Given our very recent decision in In re Initiative Petition No. 403, 2016 OK 1, 367 P.3d 472, where we rejected similar challenges to a similar initiative petition, I agree that Initiative Petition No. 416 must be allowed to proceed to the signature-collection stage. Were we to hold otherwise, our decision would appear driven by our views on the policies embodied in the initiative petition, rather than on the petition's legal sufficiency under our governing precedents.

¶2 I write separately to explain that Initiative Petition No. 416 should be allowed to proceed to the signature stage based also on the text and original meaning of our Constitution, neither of which empower the Court to issue the requested relief.

I.

¶3 In Oklahoma, all governmental powers are derived from the People.[1] When the People of Oklahoma came together to form their state government, they vested the new government with certain powers, but specifically reserved others, most notably their power to make law directly, rather than through their elected representatives. Oklahoma's Constitution was, in fact, the first state constitution to include a citizen-initiative provision when first adopted, and "[i]n many ways . . . represents the highwater mark of the populist movement in the United States."[2]

¶4 For example, Oklahoma's Bill of Rights begins with the recognition that "[a]ll political power is inherent in the People; and government is instituted for their protection, security, and benefit, and to promote their general welfare."[3] And given that the government is by the People, for the People, "they have the right to alter or reform the same whenever the public good may require it."[4] The first section of Article V, establishing a legislature, likewise emphasizes and reiterates that while "[t]he Legislative authority of the State shall be vested in a Legislature, consisting of a Senate and a House of Representatives[,] . . . the people reserve to themselves the power to propose laws and amendments to the Constitution and to enact or reject the same at the polls independent of the Legislature, and also reserve power at their own option to approve or reject at the polls any act of the Legislature."[5] Article V, Section 2 meanwhile dictates that "fifteen per centum of the legal voters shall have the right to propose amendments to the Constitution by petition," and emphasizes (again) that "[t]he first power reserved by the people is the initiative."[6] Indeed, when reading our Constitution in whole, it is striking how vociferous the People were with regard to their power to make law directly. By my count, the Constitution contains twenty-three provisions that specifically mention the People's initiative power.[7]

¶5 Importantly, the initiative power is not one granted by the Constitution, but rather one possessed by the People and predating their charter of a government. Thus, the Constitution does not define what initiative power the People possess, but rather what limitations, if any, the People opted to place on their inherent power. Thus, any legislative or judicial act that impairs the ability of the People to make law by initiative petition must be explicitly authorized by the People in their Constitution.

II.

¶6 In recent decades this Court has claimed both (1) the power to prevent the circulation of an initiative petition whose statement of the gist doesn't meet substantive standards invented by the Court,[8] and (2) the power to opine more broadly on the constitutionality of not-yet-enacted measures,[9] including whether they meet Article XXIV, Section 1's "one general subject requirement." Neither is authorized by the Constitution.

A.

¶7 The Constitution says nothing about a gist; it merely requires that "every [initiative] petition shall include the full text of the measure so proposed."[10] The notion of a gist comes from statute, where the Legislature has required that in addition to the full text of the measure, each initiative petition contain a "simple statement of the gist of the proposition" that is "printed on the top margin of each signature sheet."[11] That's it. Neither the Constitution nor statute imposes any substantive requirements on this "statement," other than that it must be "simple." Crafting a statement of the gist is thus an inherently subjective exercise, requiring judgment calls as to what stays and what gets cut in order to boil down a lengthy proposition (in this case, three-and-a-half pages) into a simple statement of "the pith of the matter"[12] capable of fitting in the "top margin" of a signature page.

¶8 Despite the People and the Legislature's decision to impose no specific requirements on the contents of the "statement of the gist," this Court has made law on the subject, mandating that the statements of the gist be "free from the taint of misleading terms or deceitful language,"[13] that they "put [the signatories] on notice of the changes being made," and that they adequately "explain the proposal's effect"[14]--not "every regulatory detail" or "theoretical effect," of course, but only the "practical" ones.[15] And lest we forget, "[t]he explanation of the effect on existing law . . . does not extend to describing policy arguments for or against the proposal"[16]--which could either mean that gists failing to describe policy arguments for or against the proposal will be upheld, or that gists describing such policy arguments will not be upheld (I, for one, can't tell which it is). Those trying to comply with these requirements must surely be scratching their heads trying to decide if they've said too much, not enough, or just enough.

¶9 When amorphous standards like these are applied, the results are predictably inconsistent. We have criticized a single gist statement for simultaneously containing both "too much and not enough information,"[17] and we have invalidated a gist for failing to mention that grocery stores had to be located more than 2,500 feet from the nearest licensee in order to be eligible for the newly proposed liquor license[18]--precisely the sort of regulatory detail that one might expect to be omitted from the summary of a proposal. The result of this confusion is that, intentionally or not, we have created a "gist" jurisprudence that involves the Court in unnecessary parsing of inherently subjective matters, which opens it up to criticism that its invalidations are driven by policy concerns rather than by the text of any law.

¶10 Moreover, these judge-made standards are unnecessary. Unlike the ballot title, the gist is not part of the final enactment stage, but rather the preliminary, signature-gathering stage. And unlike the ballot title, which is the only thing a voter has before them in the voting booth, the statement of the gist must be accompanied by the full text of the petition itself,[19] meaning that every person contemplating signing the petition has the opportunity to read the full text of the proposed law before signing. If there is any question about the effect of the law or the details of its enactment, or just plain confusion regarding the gist statement, the solicited signatory need only flip the page in order to clarify. It then makes perfect sense that the Legislature has imposed strict requirements on ballots titles, but has declined to do so with the gist, requiring nothing more of a gist statement than that it be short and simple enough to fit in the upper margin of a single page. Given that the Legislature made that decision, this Court has no business imposing substantive requirements that have no basis in the text of any statute or constitutional provision.

B.

¶11 The Constitution says the judicial power of this State is vested in part in this Court,[20] but the power conferred is specific and limited. "It is within the power of the courts to determine what the law is, after it has been enacted . . . but the courts are without power to say what law shall or shall not be enacted."[21] That is the nature of judicial power, and what distinguishes it from the power to legislate.[22] Likewise, the Constitution allows us to exercise our power to state what the law is only in the context of a justiciable case.[23] As this Court has said before:

The powers of the courts are exercised when questions arise in causes brought before them in the ordinary course of litigation, in passing upon the substantial rights of parties thereto; and then only are they called upon to decide whether a law has been legally enacted, or whether any change in the Constitution has been legally effected.[24]

Not surprisingly then, it was the rule in this State from the time of statehood until this Court's 1975 decision in In re Supreme Court Adjudication of Initiative Petitions in Norman, Oklahoma, 1975 OK 36, 534 P.2d 3, that this Court would not entertain pre-enactment challenges to the constitutionality of initiative petitions.[25] We have since abandoned these defining characteristics of the American judiciary[26] in favor of an unusual practice of pre-enactment review of a proposed measure's constitutionality.[27] In my view, this practice not only exceeds the limits placed on our power as judges under the Constitution, but also invades the legislative power of the People--the power to say "what law shall or shall not be enacted."

¶12 There are both legal and prudential reasons to abandon our practice. First, we lack the power to judge the constitutionality of a measure before it actually becomes the law. If our job is to "say what the law is," and in a constitutional challenge thus to say whether the Constitution prohibits another law from having an effect on these parties, then we cannot do that without first having a law. Otherwise, all we are doing is advising that we would draft the proposal differently or not at all--i.e., saying what the law ought to be, not what it is.

¶13 A pre-enactment challenge also necessarily lacks a plaintiff with the requisite injury-in-fact. Whether a controversy is "justiciable," determines whether we have a "case" over which the Constitution gives us the power to adjudicate.[28] A fundamental component of a justiciable controversy is that the plaintiff have an actual or imminent injury.[29] The challengers here can demonstrate neither, as the proposed amendment has not been enacted (meaning it cannot have actually injured them), nor has it even been placed on the ballot (meaning any potential injury is purely speculative--dependent on a fickle political process that may or may not result in its placement on the ballot and enactment).

¶14 As a matter of prudence, we have also always adhered to the practice of declining to opine on questions of constitutionality unless absolutely necessary.[30] This canon of constitutional avoidance represents the judiciary's long-standing recognition of the need to defer to the constitutional judgments of our co-equal branches. That is why we recognize that until we have an actual case or controversy presenting the constitutional issue in a manner that cannot be avoided, it is the Legislature's duty to make the law in accordance with the Constitution, and the Executive's duty to "cause the laws of the State,"[31] including the Constitution, to be faithfully executed. We should not abandon these principles when it is the People who are contemplating a measure, rather than the Legislature.[32] The People are, after all, the parent of this government, not its child, and it is "the function of the citizen to keep the Government from falling into error,"[33] not the other way around.

¶15 Moreover, the Court's description of the enactment of a measure that will later be deemed contrary to federal law as an "ultimately meaningless act[] in an elaborate charade,"[34] represents a fundamental misapprehension of the nature of the People's sovereign power. The People have the right to articulate the policy of their state, and while that policy may well yield to federal policy through operation of the Supremacy Clause, that doesn't render the articulation of state policy a "meaningless act."

¶16 First, there is play in the joints between things required by federal law and things barred by state law. For example, if the federal courts said that the federal Constitution granted a right to a physician-assisted suicide, the People of Oklahoma would be perfectly within their rights to enact a constitutional provision announcing a state policy against the practice if the People wanted to ensure that state actors take no action to further such suicides. In other words, Oklahoma might have to allow the suicides, but it doesn't have to facilitate them, at least not under well-accepted anti-commandeering principles.[35] The Oklahoma constitutional provision, despite being preempted in one respect, would nonetheless have the effect of preventing the Legislature and other state officials from taking affirmative actions to further federal policy. Given that federal law recognize the states' right to decline to implement federal policies with which they disagree, I am baffled as to why this Court has adopted a jurisprudence of bending the knee to federal power when no federal law requires such an abdication of state sovereignty.

¶17 Second, allowing the People to amend their Constitution to articulate a policy that may currently be preempted by federal policy allows the People to anticipate and be prepared for changes in federal policy by having a state law that will immediately spring into full effect upon the change. The People need not wait for a United States Supreme Court decision and then spend many months or years getting a new state constitutional provision in place. If the political will exists now to announce a state policy on a particular subject, the People should be allowed to do so, even if subsequent federal action is needed to fully animate it.

¶18 Third, depriving the People of their right to amend their constitution impairs their ability to shape the development of federal law. United States Supreme Court decisions on certain constitutional issues often turn on surveys of the prevailing national trends, whereby the Court examines the states' policies, as articulated in their constitutions and statutes, to determine the prevailing attitudes on the topic.[36] The People of this state have a right to participate in that process by enacting laws that, while presently pre-empted, might serve to convince the federal courts to change federal law. That is why we say that "[s]tate sovereignty is not just an end in itself," but rather exists for the protection of individuals by ensuring the counterbalancing exercise of power by both federal and state government.[37] I would hope, for example, that after a misguided and tragic decision like that rendered by the United States Supreme Court in 1857's Dred Scott v. Sandford, 60 U.S. 393 (1857), the People of this State could amend their Constitution to announce that it was the policy of this state that slavery was illegal and that no person could ever be considered another's property and deprived of their citizenship within our borders. Under our Court's jurisprudence, because such a measure would have been contrary to the then-prevailing interpretation of the federal Constitution, the People of Oklahoma would have been forbidden from casting their votes in favor of such a law. That shouldn't be the case.

¶19 The People's ability to express their views through constitutional amendment thus matters, even when those views don't align with federal policies. The People are either sovereign, or they are not. If we believe--as I do--that they are, we should rethink these precedents to re-establish the high-water mark of populist power that our founders envisioned.

* * *

¶20 For these reasons, I concur in the majority's conclusion that there are no legal barriers to Initiative Petition No. 416's circulation. I would prefer to resolve the case, however, based on the text and original understanding of our Constitution, rather than on this Court's overreaching initiative-petition jurisprudence.

FOOTNOTES

[1] Okla. Const. art. II, § 1.

[2] John F. Cooper, The Citizen Initiative Petition to Amend State Constitutions: A Concept Whose Time Has Passed, or a Vigorous Component of Participatory Democracy at the State Level?, 28 N.M. L. Rev. 227, 231 (1998) (citing Arne R. Leonard, In Search of the Deliberative Initiative: A Proposal for a New Method of Constitutional Change, 69 Temp L. Rev. 1203, 1207 & n.23 (1996)).

[3] Okla. Const. art. II, § 1.

[4] Id. The only caveat given was one required by the federal Constitution's Guarantee Clause, which guarantees that all states will maintain a republican form of government (i.e., government that is democratically accountable to the citizenry), a rejection of the monarchical rule of our country's colonial past. U.S. Const. art. IV, § 4 ("The United States shall guarantee to every state in this union a republican form of government . . . ."); see also Oklahoma Enabling Act, Pub. L. No. 59-234, ch. 3335, § 3, 34 Stat. 267, 269 (1906) (requiring that Oklahoma's "constitution shall be republican in form, and make no distinction in civil or political rights on account of race or color, and shall not be repugnant to the Constitution of the United States and the principles of the Declaration of Independence."). Oklahoma's Constitution accordingly requires that alterations to our form of state government "be not repugnant to the Constitution of the United States." Okla. Const. art. II, § 1.

[5] Okla. Const. art. V, § 1 (emphasis added).

[6] Id. § 2 (emphasis added).

[7] Id. art. II, § 1 (discussing the People's "right to alter or reform the [government] whenever the public good may require it"); id. § 9A (stating that state statutes relating to the death penalty "are in full force and effect, subject to legislative amendment or repeal by . . . initiative," among other things); id. § 18 (providing that a grand jury can be convened upon filing with a district judge "of a petition therefor signed by qualified electors of the county equal to the number of signatures required to propose legislation by a county by initiative petition as provided in Section 5 of Article V of the Oklahoma Constitution"); id. § 34 (acknowledging that "the People by initiative . . . ha[ve] the authority to enact substantive and procedural laws to define, implement, preserve, and protect the rights guaranteed to victims by this section"); id. art. V, § 1 (discussing the People's reservation of "the power to propose laws and amendments to the Constitution"); id. § 2 ("The first power reserved by the People is the initiative . . . ."); id. § 3 (describing where initiative petitions get filed, when they are voted upon, and, if approved by the People, when they take effect); id. § 5 (reserving "[t]he powers of the initiative . . . to the legal voters of every county and district therein, as to all local legislation, or action, in the administration of county and district government"); id. § 5a (establishing an initiative petition process for abolishing township government and for restoring it thereafter); id. § 6 (requiring a higher signature threshold for an initiative petition proposing a measure identical to one already rejected by the People during the three preceding years); id. § 7 (stating that the reservation of the initiative power "shall not deprive the Legislature of the right to repeal any law, propose or pass any measure"); id. § 8 (requiring the passage of laws "to prevent corruption in making, procuring, and submitting initiative . . . petitions"); id. § 58 (imposing an effective date upon enactments, except for those "carrying into effect provisions relating to the initiative"); id. art. X, § 6C(A) (giving the Legislature authority to enact laws granting incorporated towns power to provide tax relief for historic preservation, reinvestment, or enterprise areas, but requiring such laws to "provide for the local initiative power . . . of the People"); id. § 9A (discussing an additional levy of an ad valorem tax for the purpose of maintaining a county department of health "when such levy is approved . . . by initiative petition by voters of a county," to last until such level gets repealed, which may be done "by initiative petition by voters of a county"); id. § 10A (discussing the levying of a special recurring ad valorem tax for the purpose of establishing and maintaining public libraries "upon petition initiated by not less than ten percent (10%) of the qualified electors of the county"); id. art. XVIII, § 4(a) ("The powers of the initiative . . . are hereby reserved to the People of every municipal corporation . . . with reference to all legislative authority which it may exercise, and amendments to charters for its own government . . . ."); id. § 4(b) (describing how many signatures are required for municipal initiatives and with whom such initiatives are filed); id. § 4(c) (discussing an initiative petition that "demands the enactment of an ordinance"); id. § 4(e) (discussing an initiative petition that "demands an amendment to a charter" of a municipal corporation); id. art. XXIV, § 3 (stating that Article XXIV, Sections 1 and 2 "shall not impair the right of the People to amend this Constitution by a vote upon an initiative petition therefor"); id. art. XXV, § 1 (authorizing "the People by initiative petition . . . to provide by appropriate legislation for the relief and care of needy aged persons . . . and other needy persons who, on account of immature age, physical infirmity, disability, or other cause, are unable to provide or care for themselves"); id. art. XXIX, § 3 (requiring the Ethics Commission to "promulgate rules of ethical conduct . . . for campaigns for initiatives").

[8] See, e.g., OCPA Impact, Inc. v. Sheehan, 2016 OK 84, 377 P.3d 138; In re Initiative Petition No. 409, 2016 OK 51, 376 P.3d 250; In re Initiative Petition No. 384, 2007 OK 48, 164 P.3d 125.

[9] See, e.g., In re Initiative Petition No. 349, 1992 OK 122, 838 P.2d 1; In re Supreme Court Adjudication of Initiative Petitions in Norman, Oklahoma, 1975 OK 36, 534 P.2d 3.

[10] Okla. Const. art. V, § 2.

[11] 34 O.S.2011 § 3.

[12] Webster's New International Dictionary 1060 (2d ed. 1959).

[13] In re Initiative Petition No. 409, 2016 OK 51, ¶ 3, 376 P.3d at 252 (quoting In re Initiative Petition No. 384, 2007 OK 48, ¶ 9, 164 P.3d at 129).

[14] Id. (quoting In re Initiative Petition No. 384, 2007 OK 48, ¶¶ 7-8, 164 P.3d at 129).

[15] Id. (emphasis added) (quoting In re Initiative Petition No. 384, 2007 OK 48, ¶¶ 8-9, 164 P.3d at 129).

[16] In re Initiative Petition No. 384, 2007 OK 48, ¶ 8, 164 P.3d at 129.

[17] Id. ¶ 12, 164 P.3d at 130.

[18] In re Initiative Petition No. 409, 2016 OK 51, ¶¶ 6-7, 376 P.3d at 253-54.

[19] 34 O.S.2011 § 3 ("Each initiative petition . . . shall be duplicated for the securing of signatures, and each sheet for signatures shall be attached to a copy of the petition. . . . A simple statement of the gist of the proposition shall be printed on the top margin of each signature sheet.").

[20] Okla. Const. art. VII, § 1.

[21] Cress v. Estes, 1914 OK 361, 142 P. 411, 412.

[22] See In re Cty. Comm'rs of Ctys. Comprising Seventh Judicial Dist., 1908 OK 207, ¶ 12, 98 P. 557, 560 ("The distinction . . . between a judicial and a legislative act is well defined. The one determines what the law is, and what the rights of parties are, with reference to transactions already had; the other provides what the law shall be in future cases arising under it." (quoting Union Pac. R.R. Co. v. United States, 99 U.S. 700, 761 (1878) (Field, J., dissenting))).

[23] Okla. Const. art. VII, § 4 ("The appellate jurisdiction of the Supreme Court shall be co-extensive with the State and shall extend to all cases at law and in equity . . . .").

[24] Cress, 1914 OK 361, 142 P. at 412.

[25] E.g., Threadgill v. Cross, 1910 OK 165, ¶ 22, 109 P. 558, 563 ("If . . . [the People] determine [the proposed amendment] to be a valid measure and adopt it, then, and not until then, will the judicial and executive departments have the power and duty devolving upon them to determine its validity and enforce its provisions."); In re Initiative Petition No. 10 of Okla. City, 1940 OK 43, ¶ 4, 98 P.2d 896, 897; In re Initiative Petition No. 259, 1957 OK 167, ¶¶ 34-35, 316 P.2d 139, 146; Oklahomans for Modern Alcoholic Beverage Controls, Inc. v. Shelton, 1972 OK 133, ¶ 28, 501 P.2d 1089, 1095; see also In re Initiative Petition No. 349, 1992 OK 122, ¶ 32, 838 P.2d 1, 11 (noting the 1975 shift).

[26] See United States v. Windsor, 570 U.S. 744, 789 (Scalia, J., dissenting) (describing Alexis de Tocqueville's praise for our judicial system "as one which 'intimately bind[s] the case made for the law with the case made for one man" and in which "'[t]he political question that [the judge] must resolve is linked to the interest' of private litigants" (alterations in original) (quoting Alexis de Tocqueville, Democracy in America 97 (H. Mansfield & D. Winthrop eds. 2000))).

[27] A major feature of this practice is our pre-enactment review to determine compliance with Article XXIV, Section 1's "one general subject" rule. First, there is no reasoned basis upon which to distinguish this review from the "single subject" rule review of legislation that we conduct pursuant to Article V, Section 57, review which occurs only post-enactment. Second, the text of the Constitution belies this Court's view that the "one general subject" rule applies to initiative petitions. Article XXIV, Section 1, titled "Amendments proposed by Legislature--Submission to vote," states that "[n]o proposal for the amendment or alteration of this Constitution which is submitted to the voters shall embrace more than one general subject." While "[n]o proposal for the amendment or alteration of this Constitution" sounds quite broad when lifted out of context, Section 3 of the same Article clarifies that the one-general-subject requirement indeed only applies to legislative referendums: "This article shall not impair the right of the people to amend this Constitution by a vote upon an initiative petition therefor." In its decision first applying the "one general subject" rule to initiative petitions, this Court failed to account for Section 3, not even mentioning it despite the objections of both dissenters. In re Initiative Petition No. 314, 1980 OK 174, 625 P.2d 595; see id. ¶¶ 7-8, 625 P.2d at 614-15 (Lavender, C.J., concurring in part, dissenting in part) ("The restriction of article 24, section 1 as to the one general subject limitation, assuming it is applicable to the exercise of the people's right of the initiative (which may be contra to article 24, section 3) should never be strictly construed so as to inhibit the people in their right to initiate constitutional amendments. The constitutional article involved, particularly section 3 thereof, casts some doubt as to whether the one general subject limitation of the second paragraph of article 24, section 1 is even applicable to measures to amend the Oklahoma Constitution when they are being offered by the people as separate from legislatively referred measures."); id. ¶ 3, 625 P.2d at 618 (Doolin, J., dissenting) ("Section 3, Art. 24 prohibits the impairment called for by the majority opinion and was not amended or changed directly or by implication with the amendment of § 1. . . . Section 1, Art. 24 should be construed as a limitation on the legislative referendum process of amending the constitution, and not a limitation on the initiative process of the people."). If we are going to nullify a provision of the Constitution, one designed to protect the People's most fundamental right, we should at least give the provision a proper burial with an opinion that addresses Section 3 head-on.

[28] See House of Realty, Inc. v. City of Midwest City, 2004 OK 97, ¶ 12, 109 P.3d 314, 318 ("The term 'justiciable' refers to a lively case or controversy between antagonistic demands." (citing Lawrence v. Cleveland Cty. Home Loan Auth., 1981 OK 28, ¶ 7, 626 P.2d 314, 315)); In re Application of State ex rel. Dep't of Transp., 1982 OK 36, ¶ 6, 646 P.2d 605, 608-09 ("To be a proper subject for adjudication, a controversy must be 'justiciable' . . . ."); see also DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 341 (2006) ("If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so.").

[29] See In re Application of State ex rel. Dep't of Transp., 1982 OK 36, ¶ 6, 646 P.2d at 609 (discussing standing as an aspect of justiciability); Hendrick v. Walters, 1993 OK 162, ¶ 5, 865 P.2d 1232, 1236-37 (listing one of the elements of standing as "an actual or threatened injury (sometimes called injury-in-fact)"); see also Cuno, 547 U.S. at 342 ("The core component of the requirement that a litigant have standing to invoke the authority of a federal court is an essential and unchanging part of the case-or-controversy requirement of Article III. The requisite elements of this core component derived directly from the Constitution are familiar: A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." (internal marks and citations omitted)); Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) ("[T]he irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an injury in fact--an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." (internal marks and citations omitted)).

[30] Smith v. Westinghouse Elec. Corp., 1987 OK 3, ¶ 2 n.3, 732 P.2d 466, 467 n.3; Dablemont v. State, Dep't of Pub. Safety, 1975 OK 162, ¶ 9, 543 .2d 563, 564.

[31] Okla. Const. art. VI, § 8.

[32] I have no doubt that if someone filed an original action asking the Court to declare unconstitutional a bill being considered by the Legislature, we would pour them out of court, opining that there was not yet a case or controversy and that the case was not yet ripe. We would be correct to do so. But there, just as here, one could argue that the Court, if it intends to strike the measure, ought to do so pre-enactment to save the taxpayers the expense associated with a legislative session. Perhaps the difference is that this Court recognizes that the separation of powers prevents it from so interfering with the legislative process. But if the Legislature deserves that respect, so do the People.

[33] Am. Commc'n Ass'n, C.I.O., v. Douds, 339 U.S. 382, 442 (1950).

[34] In re Initiative Petition No. 349, 1992 OK 122, ¶ 32, 838 P.2d 1, 11.

[35] See, e.g., New York v. United States, 505 U.S. 144, 188 (1992) (invalidating a federal regime requiring states to implement certain regulations in furtherance of federal policy and emphasizing that "States are not mere political subdivisions of the United States. State governments are neither regional offices nor administrative agencies of the Federal Government. The positions occupied by state officials appear nowhere on the Federal Government's most detailed organizational chart. The Constitution instead 'leaves to the several States a residuary and inviolable sovereignty,' reserved explicitly to the States by the Tenth Amendment. Whatever the outer limits of that sovereignty may be, one thing is clear: The Federal Government may not compel the States to enact or administer a federal [policy]. The Constitution permits both the Federal Government and the States to enact legislation . . . [and merely] enables the Federal Government to pre-empt state regulation contrary to federal interests. . . ." (emphasis added) (citation omitted)).

[36] See, e.g., Graham v. Florida, 560 U.S. 48, 62 (2010) (relying on a 50-state survey of state law as an "objective indicia of national consensus" on the legality of certain life-without-parole sentences under the Eighth Amendment); see also Atkins v. Virginia, 536 U.S. 304, 312 (2002) (describing state law as the "clearest and most reliable objective evidence of contemporary values").

[37] New York, 505 U.S. at 181.






 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Supreme Court Cases
 Cite
Name
Level

 2018 OK 25, McDONALD v. THOMPSON
Discussed
 2018 OK 26, OKLAHOMA OIL & GAS ASSOC. v. THOMPSON
Discussed


 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Supreme Court Cases
 Cite
Name
Level

 1987 OK 3, 732 P.2d 466, 58 OBJ 68, Smith v. Westinghouse Elec. Corp.
Discussed
 1940 OK 43, 98 P.2d 896, 186 Okla. 497, In re INITIATIVE PETITION NO. 10 OF OKLAHOMA CITY
Discussed
 1914 OK 361, 142 P. 411, 43 Okla. 213, CRESS v. ESTES et al.
Discussed at Length
 1990 OK 75, 797 P.2d 326, 61 OBJ 1655, Initiative Petition No. 344, State Question No. 630, In re
Discussed
 1990 OK 76, 797 P.2d 331, 61 OBJ 1652, Initiative Petition No. 342, State Question No. 628, In re
Discussed
 1992 OK 122, 838 P.2d 1, 63 OBJ 2386, Initiative Petition No. 349, State Question No. 642, In re
Discussed at Length
 1993 OK 162, 865 P.2d 1232, 65 OBJ 33, Hendrick v. Walters
Discussed
 1994 OK 27, 870 P.2d 782, 65 OBJ 886, In re Initiative Petition No. 358, State Question No. 658
Discussed
 1957 OK 167, 316 P.2d 139, IN RE INITIATIVE PETITION NUMBER 259, ETC.
Discussed
 1908 OK 207, 98 P. 557, 22 Okla. 435, In re COUNTY COM'RS OF COUNTIES COMPRISING SEVENTH JUDICIAL DIST.
Discussed
 1910 OK 165, 109 P. 558, 26 Okla. 403, THREADGILL v. CROSS
Discussed
 1995 OK 77, 899 P.2d 1145, 66 OBJ 2313, In re Initiative Petition No. 362 State Question 669
Discussed
 1972 OK 133, 501 P.2d 1089, OKLAHOMANS FOR MOD. ALCO. BEV. CON. v. SHELTON
Discussed
 2004 OK 97, 109 P.3d 314, HOUSE OF REALTY, INC. v. CITY OF MIDWEST CITY
Discussed
 2006 OK 45, 142 P.3d 400, IN RE: INITIATIVE PETITION NO. 382, STATE QUESTION NO. 729
Discussed at Length
 2006 OK 89, 155 P.3d 32, IN RE: INITIATIVE PETITION NO. 379
Discussed
 2007 OK 48, 164 P.3d 125, IN RE: INITIATIVE PETITION NO. 384, STATE QUESTION NO. 731
Discussed at Length
 1996 OK 122, 927 P.2d 558, 67 OBJ 3423, In re Initiative Petition No. 363, State Question No. 672
Discussed at Length
 1975 OK 36, 534 P.2d 3, IN RE SUPREME COURT ADJUDICATION, ETC.
Discussed at Length
 1975 OK 162, 543 P.2d 563, DABLEMONT v. STATE, DEPARTMENT OF PUBLIC SAFETY
Cited
 2016 OK 1, 367 P.3d 472, IN RE INITIATIVE PETITION NO. 403 STATE QUESTION NO. 779
Discussed at Length
 2016 OK 51, 376 P.3d 250, IN RE INITIATIVE PETITION NO. 409, STATE QUESTION NO. 785
Discussed at Length
 2016 OK 84, 377 P.3d 138, OCPA IMPACT, INC. v. SHEEHAN
Discussed
 1980 OK 174, 625 P.2d 595, Initiative Petition No. 314, In re
Discussed
 2000 OK 17, 997 P.2d 164, 71 OBJ 721, Calvey v. Daxon
Discussed
 1981 OK 28, 626 P.2d 314, Lawrence v. Cleveland County Home Loan Authority
Discussed
 1982 OK 36, 646 P.2d 605, State ex rel. Dept. of Transp., Application of
Discussed at Length
 1998 OK 25, 958 P.2d 759, 69 OBJ 1183, In Re: OKLAHOMA CAPITOL IMPROVEMENT
Discussed
Title 34. Initiative and Referendum
 Cite
Name
Level

 34 O.S. 3, Petitions and Signatures
Discussed
 34 O.S. 8, Filing Copy of Proposed Petition - Publication - Protest - Hearing and Determination - Signature Gathering Deadline
Cited
 34 O.S. 10, Appeal Upon Question of Ballot Title
Discussed
Title 69. Roads, Bridges, and Ferries
 Cite
Name
Level

 69 O.S. 1521, Rebuilding Oklahoma Access and Driver Safety Fund
Cited


 
 








 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA